919 F.2d 183
 SALVATION ARMY (The), Appellant,
v.
DEPARTMENT OF COMMUNITY AFFAIRS OF the STATE OF NEW JERSEY,
John P. Renna, Commissioner of the Department of Community
Affairs of the State of New Jersey, Charles Mysak,
Supervisor of Enforcement, Bureau of Rooming and Boarding
House Standards of the Department of Community Affairs of
the State of New Jersey, and Bonnie Watson Carter, Chief,
Bureau of Rooming and Boarding House Standards of the
Department of Community Affairs of the State of New Jersey.
 No. 89-5705.
 United States Court of Appeals,
Third Circuit.
 Argued March 15, 1990.
Decided Nov. 5, 1990.
 
 William J. Moss, Michael G. Dolan (argued), Cadwalader, Wickersham & Taft, New York City, Peter M. Burke, Young, Rose & Millspaugh, P.C., Roseland, N.J., for appellant.
 Peter N. Perretti, Jr., Atty. Gen. of N.J., Mary C. Jacobson, Deputy Atty. Gen., John J. Chernoski (argued), Deputy Atty. Gen., Trenton, N.J., for appellees.
 Before SLOVITER, BECKER, and STAPLETON, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge:
 
 
 1
 In this action The Salvation Army ("TSA") seeks an exemption from the requirements of the New Jersey Rooming and Boarding House Act of 1979, N.J.S.A. 55:13B-1 et seq. ("the Act"), and the regulations promulgated thereunder. After the defendants, consisting of the agency, bureau, and individuals responsible for enforcement of the Act, agreed to grant an exemption to TSA with respect to a number of provisions of the Act and regulations, the district court granted summary judgment in favor of the defendants and vacated the preliminary injunction which had previously been issued.
 
 
 2
 On appeal, TSA contends that the defendants' concessions are insufficient to accommodate its right to free exercise of religion, both because the exemptions granted to it are not legally binding and because all of the provisions of the Act and regulations, whether or not the subject of an exemption, impermissibly intrude upon the practice of its religion. Initially, we conclude that in light of the exemptions granted by the defendants, TSA is not currently entitled to a declaratory judgment concerning the constitutionality of those portions of the Act and regulations from which it has been exempted. The scope of the case is thus materially narrowed.
 
 
 3
 While we had this appeal under advisement, the Supreme Court announced its decision in Employment Division, Department of Human Resources of Oregon v. Smith, --- U.S. ----, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ("Smith").[1] Since that decision appeared to provide significant new guidance on the scope of the free exercise clause, we requested supplemental briefing from the parties. After considering Smith and the comments of the parties thereon in the context of the provisions of the Act and regulations as to which the defendants still insist upon compliance by TSA, we conclude that all of TSA's objections to those provisions based on the free exercise clause alone must be rejected. We further conclude that TSA's claims under the equal protection and establishment clauses of the Constitution are without merit.
 
 
 4
 In addition to its free exercise claim, TSA's complaint asserts that the Act violates the related rights to freedom of association of it and its members, as well as their First Amendment rights generally. While these claims were largely ignored throughout the proceedings until we requested supplemental briefing in light of Smith, the seminal nature of Smith justifies TSA's renewed emphasis on these aspects of its complaint. Accordingly, we will consider the possibility that TSA might have a valid freedom of association or free speech claim. We conclude that such a possibility does exist, and will remand this case to the district court for further consideration.
 
 I. FACTS AND PROCEDURAL HISTORY
 A. The Act and Regulations
 
 5
 New Jersey's Rooming and Boarding House Act of 1979 was enacted in response to a number of deadly boarding home fires which focused public attention on the unsafe and unsanitary conditions that existed in many of these facilities. See Market Street Mission v. Bureau of Rooming and Boarding House Standards, Department of Community Affairs, State of New Jersey, 110 N.J. 335, 541 A.2d 668, 671 (N.J.), appeal dismissed, 488 U.S. 882, 109 S.Ct. 209, 102 L.Ed.2d 201 (1988); see generally Gordon & Lazarus, New Jersey's Rooming and Boarding House Act: Its Effects and Effectiveness, 12 Seton Hall L.Rev. 484 (1982). But the Act as written goes far beyond this initial motivation to ensure fire safety and safeguard the health of the residents;[2] in the course of examining the problem, the legislature learned that residents of rooming and boarding houses are frequently exploited by the operators of the facilities in a number of ways, and concluded that "[t]he residents of such facilities are predominantly elderly, disabled and poor, many of whom need social, personal and financial services, protection from building hazards and protection from unscrupulous and predatory neighbors...." N.J.S.A. 55:13B-2. Accordingly, the legislature created a detailed statutory scheme requiring licensing of all rooming and boarding house operators, and regulating virtually every aspect of the conduct of these facilities.
 
 
 6
 For the most part, the Act delegates to the Commissioner of the Department of Community Affairs ("the Commissioner") responsibility for establishing substantive standards "including, but not limited to, standards to provide for the following:"
 
 
 7
 a. Safety from fire;
 
 
 8
 b. Safety from structural, mechanical, plumbing and electrical deficiencies;
 
 
 9
 c. Adequate light and ventilation;
 
 
 10
 d. Physical security;
 
 
 11
 e. Protection from harassment, fraud and eviction without due cause;
 
 
 12
 f. Clean and reasonably comfortable surroundings;
 
 
 13
 g. Adequate personal and financial services rendered in boarding houses;
 
 
 14
 h. Disclosure of owner identification information;
 
 
 15
 i. Maintenance of orderly and sufficient financial and occupancy records;
 
 
 16
 j. Referral of residents, by the operator, to social service and health agencies for needed services;
 
 
 17
 k. Assurance that no constitutional, civil or legal right will be denied solely by reason of residence in a rooming or boarding house;
 
 
 18
 l. Reasonable access for employees of public and private agencies, and reasonable access for other citizens upon receiving the consent of the resident to be visited by them; and
 
 
 19
 m. Opportunity for each resident to live with as much independence, autonomy and interaction with the surrounding community as he is capable of.
 
 
 20
 N.J.S.A. 55:13B-6.
 
 
 21
 Pursuant to this delegation, the Commissioner has promulgated a detailed set of regulations too lengthy and detailed to summarize here. N.J.A.C. 5:27-1.1 et seq. As an example of the level of detail of these regulations, all facilities must have a living room "contain[ing] comfortable chairs sufficient for at least two-thirds of the residents or intended residents ... [and] sufficient space for socializing and for such recreational activities as card playing, reading, letter writing and watching television." N.J.A.C. 5:27-7.3. Garbage cans must be metal "or other approved material." Id. 5:27-4.3. If the facility has a lawn, deck, or porch, again chairs must be provided. Id. 5:27-7.4(a). And so forth.
 
 
 22
 The legislature also created, as a supplement to the Act, a "bill of rights" for residents of such facilities. N.J.S.A. 55:13B-17 et seq.
 
 
 23
 Every resident of a boarding facility shall have the right:
 
 
 24
 a. To manage his own financial affairs;
 
 
 25
 b. To wear his own clothing;
 
 
 26
 c. To determine his own dress, hair style, or other personal effects according to individual preference;
 
 
 27
 d. To retain and use his personal property in his immediate living quarters, so as to maintain individuality and personal dignity, except where the boarding facility can demonstrate that such would be unsafe, impractical to do so, infringes upon the rights of others and that mere convenience is not the facility's motive to restrict this right;
 
 
 28
 e. To receive and send unopened correspondence;
 
 
 29
 f. To unaccompanied access to a telephone at a reasonable hour and to a private phone at the resident's expense;
 
 
 30
 g. To privacy;
 
 
 31
 h. To retain the services of his own personal physician at his own expense or under a health care plan and to confidentiality and privacy concerning his medical condition and treatment;
 
 
 32
 i. To unrestricted communication, including personal visitation with any person of his choice, at any reasonable hour;
 
 
 33
 j. To make contacts with the community and to achieve the highest level of independence, autonomy, and interaction with the community of which he is capable;
 
 
 34
 k. To present grievances on behalf of himself or others to the operator, State governmental agencies or other persons without threat or reprisal in any form or manner whatsoever;
 
 
 35
 l. To a safe and decent living environment and considerate and respectful care that recognized the dignity and individuality of the resident;
 
 
 36
 m. To refuse to perform services for the boarding facility, except as contracted for by the resident and the operator;
 
 
 37
 n. To practice the religion of his or her choice, or to abstain from religious practice; and
 
 
 38
 o. To not be deprived of any constitutional, civil or legal right solely by reason of residence in a boarding facility.
 
 
 39
 N.J.S.A. 55:13B-19. A written statement of these rights must be posted and given to every resident, N.J.S.A. 55:13B-20, and residents may maintain a cause of action against an operator for violation of any of these rights, N.J.S.A. 55:13B-21.
 
 
 40
 Finally, the Act contains several other enforcement mechanisms, including fines of up to $5000 for each violation, N.J.S.A. 55:13B-10, injunctive remedies, N.J.S.A. 55:13B-11, and criminal penalties, N.J.S.A. 55:13B-12.
 
 
 41
 The Bureau of Rooming and Boarding House Standards ("the Bureau") is the state agency within the Department established to enforce the Act and Regulations.
 
 B. The Salvation Army
 
 42
 "The Salvation Army is a family center for the dissemination of the Gospel, for the development of Christian life, and for outreach in the particular community in which it is located. It is similar to any other church." McClure v. Salvation Army, 323 F.Supp. 1100, 1101 (N.D.Ga.1971), aff'd 460 F.2d 553 (5th Cir.), cert. denied 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972). Founded in England, and reaching American shores in 1880, as a proselytizing movement organized on a military metaphor, TSA is a distinct Christian denomination--related to Wesleyan Methodism--with all the structural and doctrinal attributes of one. "An officer is one who has first received a divine call from God and has been accepted and trained and commissioned as a Salvation Army officer. Being commissioned in The Salvation Army is the equivalent to ordination." Id.; see generally E.H. McKinley, Marching to Glory: The History of The Salvation Army in the United States (1980).
 
 
 43
 It is important to understand the role that Adult Rehabilitation Centers, such as the Paterson Center which is the subject of this case, play in the scheme of TSA's faith. Many religions, of course, engage in social welfare activities, such as running soup kitchens, day care centers, and the like. For the most part, however, these demonstrations of good will, while religiously motivated, do not have specific religious significance; rather, they are secular activities performed out of a religious desire to do good deeds. See, e.g., North Valley Baptist Church v. McMahon, 696 F.Supp. 518, 521 (E.D.Cal.1988) (preschool daycare program, established as a religiously-motivated "ministry" to "satisfy 'unmet needs' of people--whether these needs [be] physical, spiritual, or emotional," is nonetheless "secular, not religious, in nature"), aff'd 893 F.2d 1139 (9th Cir.1989), cert. denied --- U.S. ----, 110 S.Ct. 3215, 110 L.Ed.2d 663 (1990). Sometimes, however, an activity that would ordinarily be considered secular takes on religious significance. Giving a man a cracker, for example, is often simply a way of feeding him, but sometimes it is a sacrament. For TSA, operating the Paterson Center is a sacrament. "The program offered at The Salvation Army's Paterson Center is neither social nor secular in its purpose. Rather, the operation of the Centers is central to the religious mission of The Salvation Army." Affidavit of Raymond E. Howell p 23.[3]
 
 
 44
 To understand why this is so, it is necessary to understand something about TSA's theology as well as the day-to-day operation of the Paterson Center. TSA's inspiration and continuing motivation is what it perceives to be a divine command to save souls, and particularly to save "men and women untouched by ordinary religious efforts.... the underprivileged, the derelicts, the alcoholics--those rejected by society," by exposing them to the Gospel. Id. at p 2. Nor is one's salvation complete when he is exposed to the Gospel; the faithful Salvationist believes that he must save others as well. See E.H. McKinley, supra, at 33-34. Thus, proselytization is at the core of Salvationist religious practice, as it is in many religions. See, e.g., International Society for Krishna Consciousness, Inc. v. Barber, 650 F.2d 430, 441-43 (2d Cir.1981) (practice of "sankirtan," in which devotees roam public areas aggressively proselytizing, is central to Krishna religion).
 
 
 45
 Nor is the relationship between running the Paterson Center and proselytizing merely one of convenience. Just as TSA does not run the Center merely out of a religious desire to do good works, it also does not run the Center merely because offering room and board to the needy is a useful way to attract potential converts. While Rehabilitation Centers were not a part of TSA's practice from its inception, they became a central part of TSA's activities early in the organization's history, and arose naturally from TSA's program. E.H. McKinley, supra, at 53-56. Over time, the activities of TSA's Rehabilitation Centers have assumed a central role in TSA's theology:
 
 
 46
 It is a tenet of The Salvation Army that man's social problems are based on his defiance of the divine law and rebellion against the sovereign rule of God. Similarly, it is a fundamental belief of The Salvation Army that each man's particular social problem or handicap can best be remedied in conjunction with a spiritual regeneration. The Salvation Army also recognizes that each man has certain secular needs, and, unless those needs are met, spiritual regeneration is a difficult, if not impossible, task. A man without food, warm clothing or self-respect may find it impossible to appreciate the love of Jesus Christ. Christianity, as The Salvation Army interprets it, is not to be practiced or taught in a social vacuum. The most basic and fundamental of The Salvation Army's principles holds that a man's spiritual revitalization must be accompanied by a social revitalization.... Social work thus becomes part of The Salvation Army's program for the spiritual betterment of man.
 
 
 47
 Howell Affidavit p 3. In sum, the Salvation Army Rehabilitation Centers are an essential part of TSA's faith, playing a role analogous to that of a church in a more traditional Christian faith: "The Centers, such as the one in Paterson, are the tools whereby Salvation Army Officers practice and preach their basic theology--the regeneration of homeless and socially handicapped men through spiritual teaching, counselling and work therapy." Id. at p 5.[4]
 
 C. The Paterson Center
 
 48
 The Paterson Center, not unlike any other TSA Rehabilitation Center, reflects these convictions in its daily operations. The Center is a three-story brick building containing six dormitories, each with between four to ten beds, as well as rooms for the resident officers, administrative offices, a kitchen, dining room, lounge, meeting room, and chapel. The dormitories house up to fifty-two "beneficiaries" at any time. Beneficiaries are "individuals with social handicaps"--usually homeless men--who have been offered room, board and clothing because they have "recognized" their spiritual needs and agreed to take part in the Center's "work therapy and spiritual counselling programs." Howell Affidavit p 10. The Center only accepts healthy and able-bodied men as beneficiaries, because only such men are able to partake of the physical aspects of the rehabilitation program. Id. p 11.
 
 
 49
 These physical aspects consist of mandatory "work therapy," generally loading, sorting, and restoring goods donated to TSA's Thrift Stores. This activity serves to fund the Center, but is also "a means of restoring [the beneficiaries] to the mainstream of society.... The end result is a useful product for society and a man who has achieved a new self-respect." Id. p 19. The beneficiary does not receive a salary for this work, but is given a small gratuity, between five and eighteen dollars per week, "reflecting the success of the beneficiary in achieving his rehabilitation." Id. p 12. Beneficiaries are also required to engage in spiritual activities, including mandatory attendance at religious services in the Center's chapel, and spiritual counseling on whatever basis the officers determine the beneficiary to require.
 
 
 50
 In addition to these requirements, as a condition of his participation in the program the beneficiary must accept a number of restrictions on his freedom. He may not leave the Center or have visitors without permission, and must take meals and participate in various activities with the other beneficiaries. Id. pp 12, 16. "The Salvation Army believes that such communal living away from the temptations of the outside world is fundamental to the success of the spiritual goals of the program." Id. p 12. It must be emphasized that all of these restrictions on the beneficiary are only conditions of his continued participation in the program; he is free to abandon the program at any time, although doing so means forsaking residency at the Center. See Complaint p 19.
 
 
 51
 The length of the beneficiary's stay at the Center is entirely in the discretion of the Officers, and in no instance may last more than one year. "The decision as to who shall be admitted and who shall leave the Center, and when they shall leave, rests solely within the discretion of The Salvation Army Officers who operate the Center. Such discretion is a fundamental component of The Salvation Army's religious program and is central to its successful fulfillment of its religious mission." Id. p 17.
 
 
 52
 As must be obvious from the foregoing, the activities of TSA's Paterson Center are in at least some particulars inconsistent with the requirements of the Act and regulations. TSA did not confront particular conflicts, however, choosing instead to ignore the Act entirely.
 
 D. The Lawsuit
 
 53
 On February 26, 1982, the Bureau issued a "Notice of Violation and Order of the Commissioner" to TSA, notifying it that by operating the Paterson Center without a license TSA was in violation of the Act, ordering it to apply for a license within five days, threatening to impose a $5,000 fine for noncompliance, and advising of the option of contesting the order at an administrative hearing. TSA did not respond to this notice, and on March 25, 1982, a second, similar notice was issued, ordering payment of the $5,000 fine, and again ordering TSA to apply for a license within five days. Five days later, a third notice was issued, levying another $5,000 fine, and repeating the other orders.
 
 
 54
 At this point TSA, through counsel, attempted to convince the Bureau that TSA had no obligation to apply for a license, because (1) the Act was not intended to apply to institutions such as the Paterson Center, and (2) if it did apply to the Center, it would violate "the religion clauses of the First Amendment...." App. at 31. These efforts were unavailing, although the Bureau offered to rescind the fine if TSA applied for a license. Instead, TSA filed a complaint in the district court, asserting that the threatened application of the Act to TSA both chills and infringes the First Amendment rights of TSA and its members, and seeking both a declaration that the Act is invalid as applied to TSA and an injunction against its enforcement.
 
 
 55
 TSA and defendants filed cross-motions for summary judgment. In addition, the defendants asked the district court to abstain from deciding the case, both in deference to the state's administrative proceedings, Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and because the Act had not yet been authoritatively construed to apply to institutions such as the Paterson Center, Railroad Commissioners v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The district court declined to rule on TSA's motion for summary judgment "until a ruling is obtained from the state court whether or not the Act applies to the Paterson Center." App. at 208.
 
 
 56
 This order induced a paralysis in the proceedings, as TSA, having obtained a preliminary injunction, had no incentive to institute state proceedings to obtain a definitive ruling on the applicability of the Act, and the defendants declined the district judge's suggestion that they seek a declaratory judgment on this issue from the state courts. After more than a year of inactivity, the court administratively terminated proceedings.
 
 
 57
 The case finally returned to active status after Market Street Mission v. Bureau of Rooming and Boarding House Standards was decided by the New Jersey Supreme Court late in 1988. In Market Street Mission, that court held, inter alia, that the Act does apply to relief centers operated by religious groups. 541 A.2d at 672. In this way, the Pullman problem that had dissuaded the district court from deciding the cross-motions for summary judgment was removed.
 
 
 58
 At this point, the district court made further attempts to settle the case, or at least to focus the area of controversy, by directing TSA, over its objection, to write a letter to the defendants requesting specific exemptions from those portions of the Act and regulations that it believes unduly burden the free exercise of its religion, and to afford the defendants an opportunity to accommodate those requests. TSA wrote a four-page letter which, rather than explaining how specific statutory provisions and regulations interfered with TSA's religious practices and requesting waivers therefrom, requested "an exemption from all provisions of the Act and Regulations ... except for the following ..." and proceeded to specify certain health and safety regulations with which it was willing to comply. App. at 430-33 (emphasis added).
 
 
 59
 The defendants expressed frustration that TSA had failed to "articulate any problems which the Salvation Army ha[d] with any particular provision of the Act or regulations," but responded by determining for themselves what legitimate objections TSA might make, based in part on TSA's previous submissions, and deciding which provisions to waive accordingly. The result was a 115-page "booklet", reprinting the text of each statutory and regulatory provision, followed by the Bureau's position with regard to each provision. In many cases the response consisted of "No objection articulated in earlier documents and we fail to see how these requirements could interfere with the religious program of the Salvation Army." A substantial number of exemptions were granted to both statutory and regulatory provisions. In several instances, the defendants refused to waive provisions that would conflict with the operation of the Paterson Center because the effect of the provisions could be avoided by securing the written consent of the resident. For example, the Bureau refused to waive section (m) of the residents' bill of rights, guaranteeing residents the right "[t]o refuse to perform services for the boarding facility, except as contracted for by the resident and the operator," because TSA could avoid this prohibition by executing an agreement with each beneficiary at the outset of his rehabilitation. App. at 492.
 
 
 60
 TSA was not satisfied with this response, and by letter requested that the district court proceed to rule on the pending cross-motions for summary judgment. The district court acceded in this request, although not as TSA might have hoped, by granting summary judgment in favor of the defendants. In so ruling, the court expressed satisfaction that the Commissioner had adequately responded to TSA's legitimate concerns and expressed confidence, as the New Jersey Supreme Court had in Market Street Mission, 541 A.2d at 672, that the Bureau would continue to reasonably accommodate religious practices. App. at 625. TSA appeals from this ruling.
 
 II. JUSTICIABILITY
 
 61
 At the threshold of our review, we must determine what justiciable controversies remain in light of the defendants' decision to exempt TSA from various provisions of the Act and regulations. TSA contends that justiciable controversies remain with respect to all provisions of the Act, for two reasons: (1) the defendants have no power to waive statutory provisions, and therefore the putative waivers of those provisions have no effect on the case; and (2) even if the exemptions from the provisions of the Act are binding on the state, by their terms they do not prevent individual residents from enforcing the bill of rights under the private cause of action provision, and TSA remains "chilled" by the possibility of such a private suit. We reject both of these contentions. Consequently, we find that the scope of this case has been significantly narrowed by the defendants' actions.
 
 
 62
 TSA acknowledges that the controversy with regard to the waived regulations is no longer live. TSA argues, however, that the defendants are powerless to waive statutory provisions, and that therefore, in the absence of a judicial declaration, it remains subject to all provisions of the Act.[5] This position finds implicit support in the Act itself, which grants the Commissioner the power to "waive, modify or postpone the application of a regulation to the owner's facility" under certain conditions, N.J.S.A. 55:13B-5(b) (emphasis added), but is silent as to any similar power over the provisions of the Act itself.
 
 
 63
 Nevertheless, we agree with the district court's conclusion that there is currently no justiciable controversy between TSA and the state with respect to the "waived" provisions of the Act. Whether or not the defendants are authorized to exempt someone from provisions of the Act, the state can enforce the Act only through action of the defendants, and a realistic assessment of the likelihood of such action is a necessary part of the threshold inquiry concerning justiciability.
 
 
 64
 In order to present a justiciable controversy in an action seeking a declaratory judgment to protect against a feared future event, the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Steffel v. Thompson, 415 U.S. 452, 460, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974) (quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)); see also Zimmerman v. HBO Affiliate Group, 834 F.2d 1163, 1170 (3d Cir.1987). Where the plaintiff seeks a declaratory judgment with respect to the constitutionality of a state statute, even where the attack is on First Amendment grounds, there must be a "real and immediate" threat of enforcement against the plaintiff. Hardwick v. Bowers, 760 F.2d 1202, 1206-07 (11th Cir.1985) (holding heterosexual couple cannot challenge sodomy statute where state has given no indication that statute will be enforced against heterosexuals), reversed on other grounds sub nom Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986); see Younger v. Harris, 401 U.S. 37, 42, 91 S.Ct. 746, 749, 27 L.Ed.2d 669 (1971) ("A federal lawsuit to stop prosecution in a state court is a serious matter. And persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs in such cases."). Moreover, this threat must remain "real and immediate" throughout the course of the litigation. "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Steffel, 415 U.S. at 459 n. 10, 94 S.Ct. at 1216 n. 10. Where an intervening event removes these conditions, the court must not address the now-speculative controversy. See id. at 460, 94 S.Ct. at 1216 (remanding for determination of whether, in light of end of Vietnam War, plaintiff was inclined to continuing the protest activity for which defendants threatened to arrest him); In re Japanese Electronic Products, 723 F.2d 238, 318 (3d Cir.1983), reversed on other grounds sub nom. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Terry v. Penn Central Corp., 668 F.2d 188, 190 (3d Cir.1981).
 
 
 65
 Here the current record reflects not only the absence of a threat of enforcement but an express assurance that there will be no enforcement against TSA of the waived provisions of the statute. Compare Babbitt v. Farm Workers, 442 U.S. 289, 302, 99 S.Ct. 2301, 2310, 60 L.Ed.2d 895 (1979) (finding suit seeking declaratory judgment against state statute justiciable where "the State has not disavowed any intention of invoking the criminal penalty provision against [plaintiffs]") with Bowers v. Hardwick, 478 U.S. at 201, 106 S.Ct. at 2849 (Blackmun, J., dissenting) (state disavowed intention to enforce sodomy statute against heterosexuals). Moreover, under the express provisions of the statute, the defendants, even if they should attempt to extricate themselves from their commitment regarding those provisions, could not impose a fine without giving notice and an opportunity to comply. Nor could other criminal penalties be imposed until after such steps were taken.[6] N.J.S.A. 55:13B-9. In effect, the statute is enforceable by the defendants only prospectively, and the defendants' actions have, at a minimum, bestowed a grace period on TSA. We conclude that unless and until the defendants or their successors attempt to rescind the exemptions that have been granted to TSA,[7] the district court should decline to provide an advisory opinion regarding the constitutionality of these provisions.
 
 
 66
 Nor do we believe the theoretical possibility of a suit against TSA by a program beneficiary provides justification for a continuation of this litigation insofar as the "waived" provisions are concerned. In order for there to be a justiciable controversy, the court must be in a position to grant effective relief to the plaintiff, United States Parole Commission v. Geraghty, 445 U.S. 388, 395-97, 100 S.Ct. 1202, 1208-09, 63 L.Ed.2d 479 (1980), and TSA has articulated no theory under which a constitutional adjudication in this proceeding with respect to the waived provisions would bind beneficiaries who have not participated in this proceeding. We may assume for present purposes, however, that such a theory exists. TSA may not secure a declaratory judgment concerning the constitutionality of these provisions in any proceeding without showing of a real need for that relief. Nothing in the current record indicates that TSA has been threatened with suit by a former beneficiary or provides any other reason to believe that TSA's professed fear of a beneficiary suit is a realistic one.
 
 
 67
 We recognize that, unlike the possible future prospective enforcement by the State, a private suit would include the possibility that TSA's present conduct will result in an award of damages against it. This possible penalty for present conduct might conceivably "chill" TSA in the current exercise of its First Amendment rights, a prospect that the Supreme Court has always taken very seriously. See, e.g., Secretary of State of Maryland v. J.H. Munson Co., 467 U.S. 947, 956, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984); Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 767-78, 106 S.Ct. 2169, 2182-88, 90 L.Ed.2d 779 (1969). This chill might be considered a present constitutional injury that distinguishes TSA's claim from ordinary declaratory judgment cases. However, the Supreme Court has held that allegations of chilling injury are not sufficient basis for standing to challenge a government action, at least when the chill is "subjective" and not substantiated by evidence that the government action has a present and concrete effect. See Laird v. Tatum, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 2325-26, 33 L.Ed.2d 154 (1984); Meese v. Keene, 481 U.S. 465, 472-73, 107 S.Ct. 1862, 1866-67, 95 L.Ed.2d 415 (1987); see generally Note, Chilling Injuries as a Basis for Standing, 98 Yale L.J. 905 (1989). Here, TSA has not presented any evidence that the threat of a private damage suit by someone who voluntarily entered the program and was free to leave at any time has or will have a perceptible effect on the exercise of its First Amendment rights. Indeed, the prospect that TSA will alter the operation of the Paterson Center out of fear of such a suit seems highly unlikely.
 
 
 68
 In sum, we conclude that the defendants' assurance that the state will not enforce various statutory provisions against TSA suffices to remove those provisions from the scope of the current controversy. Since TSA does not dispute the efficacy of the defendants' waivers of regulatory provisions, the remaining justiciable controversy consists only of TSA's objections to the statutory and regulatory provisions the defendants have refused to waive.
 
 III. THE SMITH DECISION
 
 69
 The arguments made by TSA in its initial briefing and argument before this court have been substantially undermined by the Supreme Court's recent decision in Smith. The petitioners in the Smith case had been fired by a private drug rehabilitation organization because they ingested peyote as a sacrament in accordance with their religious beliefs as members of the Native American Church. Plaintiffs' applications for Oregon unemployment benefits had been denied on the ground that they had been discharged due to work-related "misconduct." They appealed that decision through the Oregon state courts, arguing that the state, by in effect punishing them for their religious practices, violated their free exercise rights. The state responded that the denial was justifiable because peyote use is a crime under Oregon law.
 
 
 70
 The case first found its way to the United States Supreme Court in 1988, when the Court held that violation of a valid criminal law would justify withholding unemployment benefits, and therefore deemed it necessary to remand the case to the Oregon Supreme Court to receive a conclusive determination as to whether the sacramental use of peyote is in fact proscribed by Oregon's controlled substance law. Employment Division, Dept. of Human Resources of Oregon v. Smith, 485 U.S. 660, 670, 108 S.Ct. 1444, 1450, 99 L.Ed.2d 753 (1988) ("Smith I "). On remand, the Oregon Supreme Court held that the Oregon statute contains no exception for religious peyote use, but also held that the statute as applied to the plaintiffs would violate the free exercise clause.
 
 
 71
 The United States Supreme Court again granted certiorari. In light of the holding in Smith I, the decisive question now was whether Oregon could, consistent with the free exercise clause, apply a generally applicable criminal prohibition to sacramental peyote use. The Court held that it could. Justice Scalia's opinion, which commanded a five vote majority, concluded that the free exercise clause does not apply to statutes of general applicability that are not specifically directed to religious practices.
 
 
 72
 The sincerity and centrality of sacramental peyote use to the Native American Church has been well recognized, and was not disputed in Smith. See Smith I, 485 U.S. at 667, 108 S.Ct. at 1448; Smith, 110 S.Ct. at 1613 (O'Connor, J., concurring in judgement); People v. Woody, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813, 817-18 (1964). Prior to Smith, the case law of the inferior courts construing the free exercise jurisprudence of the Supreme Court consistently concluded that application of any statute to prohibit such a religious practice must be subjected to compelling scrutiny. This understanding was erroneous. The Smith court "conclude[d] that the sounder approach ... is to hold the [compelling interest] test inapplicable to such challenges." 110 S.Ct. at 1603. Indeed, the Court held that a criminal statute of general applicability not directed at religious practices is simply not subject to free exercise challenge.
 
 
 73
 TSA now argues that "the Court's holding [in Smith ] was limited to free exercise challenges to neutral, generally applicable criminal statutes." TSA Letter Memorandum at 1-2 (emphasis in original). We cannot accept this interpretation of Smith.
 
 
 74
 There are a number of phrases in the Court's opinion that might support such a limited reading. E.g., 110 S.Ct. at 1598-99 (respondents "contend that their religious motivation for using peyote places them beyond the reach of a criminal law that is not specifically addressed to religious practice"); id. at 1603 ("Even if we were inclined to breathe into Sherbert [v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965] some life beyond the unemployment compensation field, we would not apply it to require exemptions from a generally applicable criminal law."); id. ("Whether or not the decisions [granting free exercise exemptions] are thus limited [to contexts 'where the State has in place a system of individual exemptions'], they at least have nothing to do with an across-the-board criminal prohibition on a particular form of conduct."). However, as often as the opinion makes reference to generally applicable criminal laws, it makes references that are not so limited. E.g., id. at 1601 ("[o]ur most recent decisions involving a neutral, generally applicable regulatory law that compelled activity forbidden by an individual's religion ..."); id. ("The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone ..."); id. at 1603 ("The government's ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, 'cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development.' " (quoting Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 451, 108 S.Ct. 1319, 1326, 99 L.Ed.2d 534 (1988))).
 
 
 75
 Furthermore, there are important indications in the opinion that the Court was not contemplating a distinction between criminal and civil statutes. If such a distinction were in mind, we do not believe the Court would have been as concerned as it was to distinguish and explain numerous previous free exercise cases that address "civil" statutes. E.g., 110 S.Ct. at 1602 (explaining that while United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (social security payroll taxes) purported to apply compelling interest test, the test was found to be satisfied); id. 110 S.Ct. at 1601 (characterizing Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (compulsory school attendance laws) as a "hybrid" case implicating the right of parents to direct children's education); id. (explaining Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (compelled display of license plate slogan) as "hybrid" case implicating freedom of speech). It would have been sufficient merely to explain that these cases did not involve criminal statutes.
 
 
 76
 Moreover, we doubt a distinction between criminal and civil statutes could be coherently applied since even statutes regulating what would not ordinarily be characterized as lawful activities can become criminal statutes depending on their mode of enforcement. For example, the Smith opinion frequently adverts to cases involving religious objections to a general tax. E.g., 110 S.Ct. at 1601. Tax laws are generally thought of as civil, but tax evasion is criminal. In fact, the Court cites a tax exemption case--United States v. Lee, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982)--as an example of a challenge to a criminal law. 110 S.Ct. at 1603. The New Jersey statute currently before us is analogous to tax laws in that the bulk of the Act's provisions are civil in nature, but the Act carries criminal penalties for continued violations. N.J.S.A. 55:13B-11.1. Thus, even if we were to accept some form of criminal/civil distinction, we are not certain TSA's case would benefit.
 
 
 77
 Finally, and most importantly, the rationale of the Smith opinion is not logically confined to cases involving criminal statutes. Justice Scalia's primary argument is a structural analysis of the effect of the compelling interest test:
 
 
 78
 The "compelling government interest" requirement seems benign, because it is familiar from other fields. But using the standard that must be met before the government may accord different treatment on the basis of race, see, e.g., Palmore v. Sidoti, 466 U.S. 429, 432, 104 S.Ct. 1879, 1881, 80 L.Ed.2d 421 (1984), or before the government may regulate the content of speech, see, e.g., Sable Communications of California v. FCC, 492 U.S. 115, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989), is not remotely comparable to using it for the purpose asserted here. What it produces in those other fields--equality of treatment, and an unrestricted flow of contending speech--are constitutional norms; what it would produce here--a private right to ignore generally applicable laws--is a constitutional anomaly.
 
 
 79
 110 S.Ct. at 1604. We see no reason why application of the compelling interest test to free exercise exemption claims concerning criminal statutes would be any more of a "constitutional anomaly" than application to civil statutes.[8]
 
 
 80
 In light of our rejection of this argument, we conclude that the holding in Smith controls this case. The only part of the Act or regulations which is arguably directly addressed to religious practice is the provision of the residents' bill of rights guaranteeing every resident the right "[t]o practice the religion of his or her choice, or to abstain from religious practice," N.J.S.A. 55:13B-19(n). However, the defendants have waived enforcement of this provision and, as we have seen, that waiver removes the provision from the controversy currently before us. The remainder of the Act and regulations are not specifically addressed to religious practice and therefore, under the holding of Smith, are not susceptible to a free exercise clause challenge. Accordingly, TSA's free exercise arguments, taken alone, must fail.
 
 
 81
 IV. THE "HYBRID" FREEDOM OF ASSOCIATION CLAIMS
 
 
 82
 In the aftermath of Smith, TSA has placed renewed emphasis on its assertions in the complaint that the Act violates the right to "freedom of association" that the Supreme Court has found to be implicit in the First Amendment. Before the district court, the fleeting assertion in the complaint that the Act interferes with the freedom of association rights of TSA and its adherents was never expanded upon. TSA now asserts, however, that these rights of association have been intruded upon, and that under the jurisprudence related to those rights, the State must show a compelling interest to justify that intrusion even where it has not directly attempted to regulate the exercise of religion.
 
 
 83
 Ordinarily, "[w]e ... refuse to consider issues that are raised for the first time on appeal." Newark Morning Ledger Co. v. United States, 539 F.2d 929, 932 (3d Cir.1976); see also Frank v. Colt, 910 F.2d 90 (3d Cir.1990). However, the Supreme Court has emphasized that this practice should be applied flexibly:
 
 
 84
 The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases. We announce no general rule. Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt, see Turner v. City of Memphis, 369 U.S. 350 [82 S.Ct. 805, 7 L.Ed.2d 762] (1962), or where "injustice might otherwise result." Hormel v. Helvering, 312 U.S. at 557 [61 S.Ct. 719, 85 L.Ed. 1037] [ (1940) ].
 
 
 85
 Singleton v. Wulff, 428 U.S. 106, 120-21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). Where, as here, a previously ignored legal theory takes on new importance due to an intervening development in the law, it is appropriate for us to exercise our discretion to allow a party to revive that theory. As we have indicated above, Smith represents a significant development in the prevailing law. Without the teaching of that case, TSA was quite reasonable in believing in the context of this case that its freedom of association claim would add little to its claim under the free exercise clause.
 
 
 86
 The Smith opinion offers the most direct support to date for a freedom of religious association claim. In Smith, in the course of distinguishing a number of earlier free exercise cases, the Supreme Court discussed the possibility of "hybrid" claims:
 
 
 87
 The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, or the right of parents ... to direct the education of their children. Some of our cases prohibiting compelled expression, decided exclusively upon free speech grounds, have also involved freedom of religion. And it is easy to envision a case in which a challenge on freedom of association grounds would likewise be reinforced by Free Exercise Clause concerns. Cf. Roberts v. United States Jaycees, 468 U.S. 609, 622 [104 S.Ct. 3244, 3252, 82 L.Ed.2d 462] (1983) ("An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State [if] a correlative freedom to engage in group effort toward those ends were not also guaranteed.")
 
 
 88
 110 S.Ct. at 1601-02 (most citations and footnote omitted; emphasis added). Drawing on this passage, TSA now contends that "application of the Act and Regulations to the Paterson Center falls within the purview of the 'hybrid' decisions noted by the majority in Smith wherein the Supreme Court has struck down statutes which violate not only the free exercise of religion but other constitutional guarantees as well." TSA Letter Memorandum at 9.
 
 
 89
 Because the legal landscape has materially changed since this case was before the district court, we exercise our discretion to entertain the newly advanced contentions that "[b]ecause The Salvation Army fulfills its central religious mission at its Adult Rehabilitation Centers through a comprehensive program of spiritual teaching, counselling and work therapy, the Act and Regulations infringe not only The Salvation Army's religious freedom but also upon its freedom of association and speech." Id. Cf. Roe v. Casey, 623 F.2d 829, 833-34 n. 11 (3d Cir.1980) (not inappropriate to discuss effect of change in law that occurred after district court decided case). We believe one significant issue raised by the freedom of association claim should be explored further in the district court. See id. at 842 (Hunter, J., concurring) (favoring remand to allow district court to address effect of change in law).
 
 
 90
 In NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), the Supreme Court recognized that the First Amendment implicitly protects an independent right of freedom of association. In that case, the Court held that an Alabama statute requiring the NAACP to disclose to the State the names and addresses of its members was unconstitutional because it was likely to restrain individuals in the exercise of their First Amendment rights:
 
 
 91
 Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.... It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.
 
 
 92
 Id. at 460-61, 78 S.Ct. at 1171 (citations omitted).
 
 
 93
 In NAACP v. Alabama, "[t]he Court implicitly bifurcated associational rights into their individual and collective components." Republican Party of the State of Connecticut v. Tashjian, 770 F.2d 265, 277 (2d Cir.1985), aff'd 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986). The individual component focuses on the effect of a government action on the individual's right to association with other individuals as a medium for self-expression; the collective component focuses on the rights of the organization qua association, and the effect a government action has on the organization's character.
 
 
 94
 The Supreme Court elaborated on this distinction, and on the nature of the collective right to freedom of association, in the landmark case of Roberts v. United States Jaycees, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). The Jaycees challenged a Minnesota statute that effectively required the organization to admit women into membership in contravention of its bylaws. Writing for the Court, Justice Brennan neatly categorized the Court's freedom of association jurisprudence:
 
 
 95
 Our decisions have referred to constitutionally protected "freedom of association" in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the state because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental aspect of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment--speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.
 
 
 96
 Id. at 617-18, 104 S.Ct. at 3249.
 
 
 97
 A. The Freedom to Associate for Religious Purposes
 
 
 98
 The first "sense" described in Roberts, the "freedom of intimate association," attaches only to "certain kinds of highly personal relationships," id. at 618, 104 S.Ct. at 3250, such as marriage and family relationships, which are essential to "the ability independently to define one's identity that is central to any concept of liberty." Id. at 619, 104 S.Ct. at 3250. Most religious groups do not exhibit the distinctive attributes the Court has identified as helpful in determining whether the freedom of association is implicated--"relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship," id. at 620, 104 S.Ct. at 3250. While the relationship between persons who choose to associate for religious purposes may ultimately be recognized as the kind of self-defining relationship the Court identifies as a crucial aspect of individual liberty, cf. Gedicks, Toward a Constitutional Jurisprudence of Religious Group Rights, 1989 Wisc.L.Rev. 99, 106-15 (1989) (religion is the single most important voluntary group affiliation in many people's lives), the Supreme Court has not as yet taken this step. Nor do we understand TSA to be making this ambitious claim.
 
 
 99
 The Supreme Court has already indicated, however, that association for religious purposes is in some circumstances protected by the second "sense" of freedom of association, the "freedom of expressive association."
 
 
 100
 An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed. According protection to collective effort on behalf of shared goals is especially important in preserving political and cultural diversity and in shielding dissident expression from suppression by the majority. Consequently, we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.
 
 
 101
 Roberts, 468 U.S. at 622, 104 S.Ct. at 3252 (citations omitted; emphases added). As in this quote, the Court has repeatedly included religion among the activities encompassed by this right. E.g. id. at 618, 104 S.Ct. at 3250; Rotary Club of Duarte v. Board of Directors of Rotary Intern., 481 U.S. 537, 544, 107 S.Ct. 1940, 1945, 95 L.Ed.2d 474 (1987); NAACP v. Alabama, 357 U.S. at 460-61, 78 S.Ct. at 1170-71; see also Correa-Martinez v. Arrillage-Belendez, 903 F.2d 49, 57 (1st Cir.1990) ("[T]he first amendment does not protect against all deprivations arising out of an act of association unless the act itself--say, joining a church ... falls within the scope of activities eligible for inclusion within the constitutional tent."); Doe v. City of Butler, Pa., 892 F.2d 315, 323 (3d Cir.1989); St. German of Alaska Eastern Orthodox Catholic Church v. United States, 840 F.2d 1087, 1094 (2d Cir.1988) (applying compelling interest test to freedom of association claim by monastery). Moreover, in stating that it could "[easily] envision a case in which a challenge on freedom of association grounds would ... be reinforced by Free Exercise Clause concerns," 110 S.Ct. at 1602, the Court in Smith appeared to confirm its willingness to recognize a right to associate for religious purposes.
 
 
 102
 We therefore agree with TSA that it and its members have a constitutionally secured right to associate for religious purposes. We are unable, however, to agree that this right materially aids its case. More specifically, we conclude that the religious motivation of those who associate for religious purposes does not entitle them to an exemption from a generally applicable statute regulating boarding houses.
 
 
 103
 The Court has not yet defined the parameters of the right to associate for religious purposes, but it has made it clear that the right to expressive association is a derivative right, which has been implied from the First Amendment in order to assure that those rights expressly secured by that amendment can be meaningfully exercised. See NAACP v. Alabama, 357 U.S. at 460-61, 78 S.Ct. at 1170-71; Roberts, 468 U.S. at 618, 104 S.Ct. at 3249 ("The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties."). Thus, there is no constitutional right to associate for a purpose that is not protected by the First Amendment. See City of Dallas v. Stanglin, 490 U.S. 19, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989) (ordinance limiting use of dance halls by persons between ages of 14 and 18 does not violate freedom of association, as interaction at dance halls "simply do[es] not involve the sort of expressive association that the First Amendment has been held to protect"). In this context, it is important to recognize that religious organizations might engage in two different types of activity that are protected by the First Amendment: (1) expression of ideas, which is protected by the free speech clause whether the ideas in question are religious or not; and (2) exercise of religion, which may include actions that are not covered by the free speech clause. As we shall explain, the correct freedom of association analysis depends upon the nature of the activity for which protection is claimed.
 
 
 104
 After Smith, it is apparent that the right to free speech has different contours than the right to free exercise of religion, and, accordingly, the right of expressive association has different contours depending upon the activity in which a group is engaged. We would not expect a derivative right to receive greater protection than the right from which it was derived. In the context of the right to exercise of one's religious convictions, we think it would be particularly anomalous if corporate exercise received greater protection than individual exercise--if, for example, the right to congregational prayer received greater protection than the right to private prayer. Similarly, we would not expect the Supreme Court to treat the use of peyote for religious purposes in groups differently than the right to do so individually. As we have seen, the primary right of free exercise does not entitle an individual to challenge state actions that are not expressly directed to religion. Accordingly, the derivative right to religious association could not entitle an organization to challenge state actions, such as those at issue in the present controversy, that are not directly addressed to religious association.[9]
 
 
 105
 Because the present controversy does not concern any state action directly addressed to religion, TSA cannot receive protection from the associational right derived from the free exercise clause.
 
 
 106
 B. The Right to Association for Free Speech Purposes
 
 
 107
 Our rejection of this association claim, however, does not prevent TSA from invoking the right to associate for free speech purposes. TSA, through the proselytizing function of its Paterson Center program, engages in free speech activities. Unlike the derivative right of religious association, the right to associate for free speech purposes does not require that the challenged state action be directly addressed to the constitutionally protected activity. The Roberts opinion teaches that strict scrutiny is to be applied to infringements on the freedom of association for free speech purposes even when the challenged action is not specifically directed to the exercise of that right. 468 U.S. at 624-25, 104 S.Ct. at 3253-54. To invoke this scrutiny, it is sufficient that TSA seeks to communicate a message; for this purpose it is not relevant that TSA's message happens to be religious in nature.
 
 
 108
 In Roberts, the Court gave a brief list of the types of action that would constitute infringement of the freedom of association for free speech purposes:
 
 
 109
 Government actions that may unconstitutionally infringe upon this freedom can take a number of forms. Among other things, government may seek to impose penalties or withhold benefits from individuals because of their membership in a disfavored group, it may attempt to require disclosure of the fact of membership in a group seeking anonymity, and it may try to interfere with the internal organization or affairs of the group. By requiring the Jaycees to admit women as full voting members, the Minnesota Act works an infringement of the last type. There can be no clearer example of an intrusion into the internal structure or affairs of an association than a regulation that forces the group to accept members it does not desire. Such a regulation may impair the ability of the original members to express only those views that brought them together.
 
 
 110
 468 U.S. at 622-23, 104 S.Ct. at 3252 (citations omitted). Roberts also made clear that the government action must not only be "intrusive," but must have an actual, rather than speculative, impact on the group in its exercise of First Amendment rights of expression. Id. at 626-28, 104 S.Ct. at 3254-55. Thus far, courts have recognized two different types of impact: (1) the challenged state action may have a demonstrable effect on the group's message, e.g., Democratic Party of the United States v. Wisconsin ex rel. La Follette, 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981); Tashjian, 770 F.2d at 282, or (2) the state action may diminish the organization's effectiveness by discouraging individuals from associating with the organization, e.g. NAACP v. Alabama.
 
 
 111
 The defendants have granted exemptions from every provision the current record demonstrates to work an infringement on TSA's right to association for free speech purposes. They have taken seriously their duty to accommodate the constitutional rights of TSA and have, through these exemptions, eliminated most if not all of the problems. TSA has not articulated, and we cannot conceive of, any way in which the non-waived statutory and regulatory provisions might alter the character of the message it seeks to convey. Having scrutinized the list of statutory and regulatory provisions remaining in controversy, we find that the only non-waived provisions that might have worked an infringement of the second type, by discouraging individuals from taking part in TSA's activities, are the regulations requiring disclosure of information concerning each resident, including full name, date of birth, previous address, and next of kin.
 
 
 112
 Even before litigation was started, TSA made it clear that it felt an obligation to maintain the confidentiality of the beneficiaries. TSA's reasons for resisting disclosure of such information are similar to--albeit perhaps not as compelling as--the NAACP's reasons for protecting the identity of its Alabama members: "As a matter of policy, The Salvation Army has always maintained confidentiality with respect to the beneficiaries of its religious and social programs. This encourages the beneficiaries to participate in The Salvation Army programs and protects their privacy." Howell Affidavit p 35. Nonetheless, the defendants have refused to grant an exemption from this requirement, stating that "[w]e fail to see how maintaining certain records concerning residents conflicts with [T]he Salvation Army's program, or how its religious practice requires or entitles it to conceal the identity of residents." App. at 540.
 
 
 113
 The defendants' response appears to miss the point of TSA's objection to disclosing the identity of its beneficiaries. TSA does not assert any religiously held belief in maintaining such confidentiality. Rather, TSA's desire to preserve confidentiality is an institutional one: disclosure discourages participation in the program. As the Supreme Court recognized in NAACP v. Alabama, forced disclosure may chill individuals from associating with a group engaged in expression protected by the First Amendment. Individuals in Alabama in the 1950's were obviously justified in not wishing the state authorities to know of their association with the NAACP. In light of the various and sundry backgrounds of TSA's beneficiaries we do not doubt that they have such fears as well. On the other hand, it is likely that the defendants have a greater interest in such disclosure than Alabama had in that seminal case. Since these factual issues have not been adequately explored, we shall leave them to be further developed on remand. TSA will have an opportunity to present evidence to the district court demonstrating that complying with the reporting requirements will dissuade individuals from participating in its rehabilitation program. If TSA makes a prima facie showing, the defendants will then have an opportunity to demonstrate that the reporting requirement is narrowly tailored to a compelling interest.[10]V. EQUAL PROTECTION CLAIM
 
 
 114
 TSA's equal protection claim[11] focuses on the fact that the Bureau does not enforce the Act against "those facilities inhabited solely by members of an order of nuns, brothers, priests, or ministers." Affidavit of John T. Monahan p 3, A. 221. The defendants base this distinction on the policy behind the Act:
 
 
 115
 A facility such as the Salvation Army's, which provides room, board, and clothing to members of the public who are homeless and socially handicapped is differently situated from a facility which houses a rabbi, minister, or priest and his family, or a group of individuals who are primarily engaged in the dissemination of a religious doctrine. This latter type of facility is inhabited by persons whose dedicated and primary vocation is that of cleric, minister, priest, rabbi or nun.... The Act is intended to protect the poor and socially handicapped who reside in boarding facilities. N.J.S.A. 55:13B-2. The poor and socially handicapped who reside in the Salvation Army's facility are the recipients of the good works of those who are engaged in the dissemination of a religious doctrine. They are not officers or ministers of the Salvation Army....
 
 
 116
 Defendants' Brief at 47. The proffered distinction does not turn on the religious character of a nun or priest's vocation, but rather the "poor and socially handicapped" nature of TSA's beneficiaries.[12] Since this distinction does not implicate a suspect class, only rational basis scrutiny is required. We believe the proffered justification passes this test, and accordingly reject TSA's equal protection claim.
 
 VI. ENTANGLEMENT CLAIM
 
 117
 TSA's establishment clause claim relies purely on the excessive entanglement prong of the familiar three-pronged Lemon test. Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). In essence, the argument is that the New Jersey Act pervasively enmeshes the State in the day-to-day activities of TSA's Center through inspections and regulation of minutiae, and thereby impermissibly entangles itself in what is properly the province of the religious organization. The Supreme Court has repeatedly stated that
 
 
 118
 routine regulatory interaction which involves no inquiries into religious doctrine, no delegation of state power to a religious body, and no "detailed monitoring and close administrative contact" between secular and religious bodies, does not of itself violate the nonentanglement command.
 
 
 119
 Hernandez v. Commissioner of Internal Revenue, 490 U.S. 680, 109 S.Ct. 2136, 2147, 104 L.Ed.2d 766 (1989) (citations omitted); see also Jimmy Swaggart Ministries v. Board of Equalization, --- U.S. ----, 110 S.Ct. 688, 699, 107 L.Ed.2d 796 (1990); Tony & Susan Alamo Foundation v. Sec'y of Labor, 471 U.S. 290, 305, 105 S.Ct. 1953, 1963, 85 L.Ed.2d 278 (1984). We see no relevant distinction between the regulatory schemes at issue in those cases and the New Jersey Act. Accordingly, we conclude that TSA has no valid establishment clause claim.
 
 VII. CONCLUSION
 
 120
 For the foregoing reasons, we shall vacate the judgment of the district court, and remand for further proceedings consistent with this opinion.
 
 
 121
 BECKER, Circuit Judge, concurring dubitante[1].
 
 
 122
 I essentially agree with the court's conclusions that: (1) the Department of Community Affairs has the power to waive enforcement of the Rooming and Boarding House regulations; (2) there was no justiciable controversy between TSA and the state regarding the waived provisions of the regulations; (3) with respect to the non-waived provisions of the regulations and the residents' "bill of rights," TSA's objections based on the free exercise claim alone must be rejected on the authority of Smith; (4) in view of the change in the law wrought by Smith, it is appropriate to explore on appeal the existence vel non of a hybrid right of association reinforced by free exercise claim concerns even though the issue was not raised in the district court; (5) no hybrid right based upon religious association can survive Smith; and (6) TSA's equal protection and entanglement claims are without merit. I therefore join in parts III, IVA, V and VI of the court's opinion. However, although I agree with some of the underpinnings of parts II and IVB, I doubt the correctness of the ultimate conclusions of those segments of the opinion, hence this separate statement.
 
 I.
 
 123
 With the narrow exception carved out in Part IV of its opinion (relating to a hybrid right of association reinforced by free exercise claim concerns), the court has held that TSA's constitutional challenge to various provisions of the New Jersey Rooming and Boarding House Act ("the Act") and the "bill of rights" fails for two independent reasons: (1) the Department of Community Affairs' "waiver" of regulatory enforcement and the unlikelihood of a private suit by a resident render TSA's challenge unripe; and (2) the Supreme Court's recent decision in Employment Division, Department of Human Resources of Oregon v. Smith, --- U.S. ----, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), precludes TSA's free exercise challenge. Although I generally concur with these two rationales and the court's result, I am concerned that the court, to TSA's detriment, has painted with too broad a brush, at least in one spot on the canvas.
 
 
 124
 In particular, I am concerned about clause (n) of the residents' "bill of rights." This clause empowers a resident ("beneficiary") of a TSA facility to bring a private suit against TSA to enforce his or her "right ... to practice the religion of his or her choice, or to abstain from religious practice." N.J.S.A. 55:13B-19(n). As with other provisions of the Act and "bill of rights," TSA believes that clause (n) infringes upon its free exercise rights, and thus would have us render a declaratory judgment that the provision is unconstitutional. I believe that TSA may have a point with respect to clause (n). I am not sure that either of the court's rationales--ripeness or Smith--is sufficient to deny TSA's clause (n) challenge.
 
 A.
 
 125
 Although the Department of Community Affairs may waive enforcement of administrative regulations, it clearly lacks the authority to waive the private right of action granted beneficiaries under the "bill of rights." The court does not hold to the contrary. Thus, a genuine possibility remains that a beneficiary will sue TSA, for actual and punitive damages, for violating clause (n). See N.J.S.A. 55:13B-21. The question is whether, in light of this possible suit, TSA's free exercise challenge to clause (n) is ripe for review.
 
 
 126
 The standard applicable to determination of ripeness is whether the prospect of suit is "not imaginary or speculative." Younger v. Harris, 401 U.S. 37, 42, 91 S.Ct. 746, 749, 27 L.Ed.2d 669 (1971). I am not convinced that it is imaginary or speculative that a beneficiary would sue TSA alleging that he or she improperly was forced to attend religious services. Indeed, I believe it is quite possible that such a suit eventually will be brought. This threat of suit is sufficiently tangible and immediate, in my view, to warrant holding TSA's clause (n) claim ripe.
 
 
 127
 The argument for ripeness becomes even more compelling, however, when one considers TSA's claim that the threat of such a suit also will have a significant and immediate "chilling" effect on the exercise of its first amendment rights. The court intimates that any such "chilling" would be the product of TSA's "subjective," which I take to mean irrational, idiosyncratic, or unreasonable, fear of a private suit. See majority at 194. I disagree.
 
 
 128
 In purely rational, if somewhat simplified, terms, the appropriateness of TSA's feeling "chilled" can be analyzed in terms of its expected damages for continuing to engage in its mission. This expected damage calculation is the product of three variables: (1) the probability that a suit will be brought; (2) the probability that TSA will be adjudged to have violated its beneficiaries' rights; and (3) the magnitude of damages that would be awarded. As I have already noted, the possibility of suit is not insubstantial. The possibility that TSA will be adjudged liable is difficult to assess (a circumstance that itself warrants additional caution by TSA). Considering, however, that it appears to be violating the plain language of clause (n), TSA must assume its prospect of liability to be significant. If TSA's activities were ultimately found violative of clause (n), its liability--considering the numerous beneficiaries who might join in a class action--could be sizeable.
 
 
 129
 Admittedly, this is a cursory review of TSA's prospects. No doubt TSA has assessed its prospects in considerably greater detail. I am unwilling, however, based on this analysis, to conclude that TSA is irrational or unreasonable on this point. Indeed, I think it obvious that TSA has an eminently rational reason to feel "chilled" in the ongoing exercise of its mission.
 
 
 130
 In light of TSA's objectively reasonable claim that it will be "chilled" in the exercise of important constitutional rights, the court's "realistic" standard for ripeness may be too high. See majority at 193-94 (arguing that "[n]othing in the current record indicates that TSA has been threatened with suit by a former beneficiary or provides any other reason to believe that TSA's professed fear of a beneficiary suit is a realistic one." (emphasis added)). The caselaw seems to support my view. See, e.g., Planned Parenthood Ass'n. v. Kempiners, 700 F.2d 1115, 1122 (7th Cir.1983) ("Requirements of ripeness are less strictly construed in the first amendment context due to the chilling effect on protected expression which delay might produce."); see also 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3532.3 (2d ed. 1984) ("First Amendment rights of free expression and association are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss.").[2]
 
 B.
 
 131
 In addition to the ripeness concerns explained above, I find the court's avoidance of TSA's clause (n) claim unsatisfactory for another reason. I believe that it is possible that clause (n) is specifically directed to religious practice and therefore not within the ambit of Smith. The holding in Smith is that generally applicable laws that, although not intended to regulate religious beliefs or practices, do so incidentally, cannot be challenged on free exercise grounds. 110 S.Ct. at 1602. Hence, Oregon's decision to criminalize the possession of controlled substances, including peyote, was found not to infringe upon the free exercise rights of members of the Native American Church. I am not convinced, however, that clause (n) fairly can be described as a generally applicable law not intended to regulate religion. Indeed, the plain language of the clause speaks directly to "religious practice."
 
 
 132
 The implications of this conclusion, for me at least, are not clear. That is because I am not sure whose free exercise rights should properly concern us if TSA were permitted to challenge clause (n)--those of the beneficiaries or those of TSA. This is a subtle and difficult question. In most cases involving an organization's challenge to governmental regulation, the interests of the organization and its members, vis a vis the government, are roughly or completely congruent. Here, however, the respective free exercise interests of TSA and its beneficiaries appear substantially at odds. That is because it seems likely that at least some of TSA's beneficiaries are not interested in religion, or at least not in TSA's type of religion, but rather are at the Center to put their lives in order. By contrast, TSA wishes to pursue its mission to rehabilitate the socially downtrodden, in part through religious indoctrination, notwithstanding the religious predispositions of its beneficiaries. In view of my dubitante posture, however, I do not attempt to resolve this difficult legal issue here.
 
 C.
 
 133
 Despite what may be read as my intimation that the case is quite justiciable, and outside the scope of Smith, I am not sufficiently certain of my ground to lodge a dissent. This is, in part, because I think the ripeness issue is exquisitely close and because the considerable tension between the free exercise rights of TSA and its beneficiaries may well justify the court's conclusion that TSA's challenge is unripe. Arguably, the court will be in a better position to consider this issue in any future litigation brought against TSA by a beneficiary or class of beneficiaries. At such time, the beneficiaries would be able to present their interests personally, and presumably more forcefully than the state seems willing to do at this juncture. Nonetheless, I remain dubitante.
 
 II.
 
 134
 I turn to the court's recognition of the continuing viability, unhindered by Smith, of TSA's hybrid right to associate for free speech purposes. I find the court's legal analysis most impressive. However, I find the analogy upon which the court rests the final result (including the remand to the district court for factfinding) unpersuasive.
 
 
 135
 In NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), without which the court's opinion falters, there was an "uncontroverted showing" that NAACP members whose identities were disclosed had suffered "economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." See id. at 462, 78 S.Ct. at 1172. The analogy to NAACP in this case is founded on the Howell Affidavit, wherein TSA declares its desire for confidentiality and intimates that disclosure of the identities of beneficiaries might discourage their participation in its mission. However, considering the information required to be disclosed to the regulators (and to no one else), I think it implausible to suggest that we face here the kind of potential harm present in NAACP. The required information about the beneficiaries--name, date of birth, previous address, and next of kin--seems to me relatively innocuous in this context. Indeed, the beneficiaries might want such information kept for their protection, and the state interest in obtaining it seems strong.
 
 
 136
 At all events, there is a huge difference between disclosure of this kind of information--which at most would embarrass someone trying to shield his or her misfortune from prying eyes--and that involved in NAACP, which, if disclosed to the wrong persons, could have led to threats, to economic harm, and perhaps to serious personal injury. Although the court simply proposes to remand so that TSA can attempt to bring this case under the umbrella of NAACP, it seems to me extremely unlikely that TSA can do so. I doubt that the game is worth the candle.
 
 III.
 
 137
 In short, the court may be right: (1) that TSA's clause (n) challenge is neither ripe nor permitted by Smith; and (2) that TSA has a protectible, hybrid right of association based upon speech and reinforced by the free exercise clause that may have been infringed. But I remain dubitante, hence this separate statement.
 
 
 
 [1]
 As indicated below, the Smith case was the subject of a previous Supreme Court opinion in 1988, referred to herein (and by the Supreme Court in Smith ) as "Smith I." Employment Division, Dept. of Human Resources of Oregon v. Smith, 485 U.S. 660, 108 S.Ct. 1444, 99 L.Ed.2d 753 (1988). We shall be referring frequently to the latter, far more important Smith opinion, which for convenience' sake we shall refer to simply as "Smith" rather than "Smith II."
 
 
 [2]
 In fact, the fire safety regulations promulgated pursuant to the Act were superseded by the New Jersey Uniform Fire Code, N.J.A.C. 5:18, and are no longer at issue in this case, as TSA does not object to compliance with this Fire Code
 
 
 [3]
 By contrast, TSA does engage in certain "good works" that are by its own admission secular in nature. See Dodge v. The Salvation Army et al., No. S88-0353 (S.D.Miss. Jan. 9, 1989) (employment discrimination suit filed by former employee of TSA Domestic Violence Shelter, an avowedly secular operation receiving substantial state, federal and local government funding); Affidavit of Albert Avery, App. at 132-34 (explaining that TSA submits to state regulatory requirements with regard to its various health care institutions and retirement homes because they are secular activities)
 
 
 [4]
 Throughout the proceedings, the defendants have disputed this characterization of TSA's activities, as in this statement from its brief on appeal:
 The Salvation Army in the operation of its boarding facility for the poor and socially handicapped is engaged in a religious activity--the dissemination of a religious doctrine to its residents--and a secular activity--the providing of food, shelter, and clothing to its residents. The State is only concerned with the latter activity. The secular activity of providing food, shelter, and clothing to the homeless and socially handicapped cannot be equated with the teaching of a religious doctrine.
 Appellees' Brief at 35. We are required to give a very sympathetic ear to TSA's expression of its religious beliefs. "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith." Hernandez v. Commissioner of Internal Revenue, 490 U.S. 680, 109 S.Ct. 2136, 2149, 104 L.Ed.2d 766 (1989). See infra note 7.
 
 
 [5]
 The district court did state that even if the defendants' waivers were ineffective, in light of the purposes of the Act the court "would excise as to the Salvation Army's Paterson Center, the provisions as to which the Commissioner granted exemptions." Transcript of Opinion at 37. While this statement facially appears to be a holding in the alternative, the only order issued by the court contains no such "excisions," but simply grants summary judgment for the defendants
 
 
 [6]
 The Act provides criminal penalties under three circumstances: (1) knowing failure to correct or abate a violation within the time period specified in a notice from the Commissioner; (2) knowingly failing to comply with an order of the Commissioner after a finding of imminent hazard (providing a more severe penalty than (1)); or (3) knowing operation of a boarding or rooming house without a valid license. N.J.S.A. 55:13B-11.1. The defendants have undertaken to provide TSA with a license without a commitment that it will comply with the exempted provisions of the Act and regulations
 
 
 [7]
 We note that in their supplemental memorandum commenting on Smith, the defendants reaffirmed their intention to adhere to the exemptions
 
 
 [8]
 The Court's supporting arguments are likewise unrestricted to the criminal context. For example, the Court regarded Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1879), as the controlling precedent. It quoted the central argument of Reynolds as follows:
 Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.... Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.
 Reynolds, 98 U.S. at 166-67, quoted in Smith, 110 S.Ct. at 1600. While Reynolds involved a statute prohibiting polygamy that carried criminal sanctions, its rationale does not support the proffered distinction based upon the enforcement strategy of the state.
 
 
 [9]
 By saying that there are some situations in which a free exercise claim will "reinforce" a freedom of association claim, Smith, 110 S.Ct. at 1602, the Court in Smith did imply that the conjunction of these rights will protect activity that would not be protected if it were not religious in nature; in other words, the free exercise clause could only be said to add to freedom of association if it encompasses situations that would not be protected solely on the basis of other parts of the First Amendment. We believe the Court was contemplating situations where state action is directly addressed to association for religious purposes. Cf., e.g., Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (invalidating statute imposing registration and reporting requirements on certain religious organizations)
 The right to associate for free speech purposes, like the right of free speech itself, protects the ability to communicate. As in Roberts, the crucial question where such a claim is involved is whether the state action has impaired the organization's ability to communicate its message. By contrast, where state action is directly addressed to religion, the free exercise clause protects religious exercise even when it is not communicative in nature--for example, the right would be implicated by a state statute prohibiting solely religious use of peyote, even though there is clearly nothing communicative about peyote use. Similarly, where state action specifically attempts to regulate corporate religious practice, the derivative right to associate for religious purposes will extend beyond the right to associate for free speech purposes by protecting even non-communicative religious exercise.
 
 
 [10]
 Based on the current record, we perceive no other areas in which TSA might be able to show a substantial burden from non-waived provisions of the statute on the rights of it and its adherents to associate for free speech purposes. However, the current record reflects TSA's general unwillingness to this point to be specific about the burdens imposed by the statute and regulations on its First Amendment rights. It may be that TSA on remand will wish to demonstrate burdens not apparent from the current record. To the extent TSA attempts to demonstrate burdens on the right to associate for free speech purposes and the district court believes its failure to earlier attempt such a showing reflects a strategy based on a pre-Smith legal landscape, the district court may exercise its discretion in favor of expanding the remand proceedings
 
 
 [11]
 The equal protection claim was apparently first suggested by Judge Lacey during the hearing on the preliminary injunction. Subsequently, TSA's counsel requested Judge Barry to grant leave to amend the complaint to include such a claim, which she granted; however, our review of the record indicates that no such amendment was ever made. The original, and still the only, complaint makes no reference to the equal protection clause. Nonetheless, we will assume the equal protection claim was properly brought
 
 
 [12]
 TSA has acknowledged in affidavits that their residents are "poor and socially handicapped."
 
 
 [1]
 The term "dubitante" "is affixed to the name of the judge in the reports to signify that he doubted the decision rendered." Black's Law Dictionary 448 (5th ed. 1979). Dubitante opinions are relatively rare, although not altogether novel; a computer assisted search of federal court cases yielded 101 cases containing or citing to dubitante opinions
 
 
 [2]
 It follows that TSA's free exercise challenges to all of the provisions of the "bill of rights"--not just its challenge to clause (n)--may be ripe. This would not alter, however, the correctness of the majority's rejection of TSA's challenges to the provisions other than clause (n). As discussed below, because these provisions do not address religion directly, TSA's challenges to them fail independently under Smith