**BELL ATLANTIC CORPORATION,**
a Delaware corporation, et al.,
Plaintiffs,

v.

**MFS COMMUNICATIONS CO., INC.,**
a Delaware corporation, et al.,
Defendants.

Civ. A. No. 95–67 MMS.

United States District Court,
D. Delaware.

Sept. 19, 1995.

Thomas P. Preston, and William E. Manning, Duane, Morris & Heckscher, Wilmington, Delaware (Dan K. Webb, Jerome W. Pope, and Thomas R. Bearrows, Winston & Strawn, Chicago, Illinois; Mark L. Evans,

Kellogg, Huber, Hansen, Todd & Evans, Washington, DC; James R. Young, John Thorne, and Robert H. Griffen, Bell Atlantic Corporation, Arlington, Virginia; Joshua W. Martin III, Bell Atlantic–Delaware, Inc., Wilmington, Delaware; of counsel), for plaintiffs.

Victor F. Battaglia, Sr., and Robert K. Beste, Jr., Biggs & Battaglia, Wilmington, Delaware (David J. Boise, and Jeffrey L. Friesen, Cravath, Swaine & Moore, New York City; Terrence J. Ferguson, MFS Communications Co., Inc., Omaha, Nebraska; Swidler & Berlin, Chtd., Washington, DC, of counsel), for defendants.

MURRAY M. SCHWARTZ, Senior District Judge.

Plaintiffs Bell Atlantic Corporation and its subsidiary businesses (collectively "Bell Atlantic") have brought this action against defendants MFS Communications Company, Incorporated, and its subsidiary businesses (collectively "MFS") pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and § 203(a) of the Communications Act, 47 U.S.C. § 201 *et seq.* *See* Docket Item ("D.I.") 33 (Amended Complaint). In Counts I and II, Bell Atlantic seeks a declaration that MFS cannot state a cause of action against Bell Atlantic based on allegations of anti-competitive conduct and that Bell Atlantic has violated neither state nor federal antitrust laws; in Count III, Bell Atlantic seeks injunctive and monetary relief for defendants' alleged violations of 47 U.S.C. § 203(a). Defendants have moved pursuant to Federal Rule of Civil Procedure 12(b)(1) to dismiss all counts of plaintiffs' amended complaint for lack of subject matter jurisdiction. *See* D.I. 9.

The defendants' motion treats Counts I & II of plaintiffs' amended complaint jointly and raises three issues: i) whether the court has jurisdiction to hear these counts under 28 U.S.C. § 1331, the "federal question" statute; ii) if so, whether these counts are justiciable under Article III of the United States Constitution; and, iii) if so, whether the Court should use the discretion granted under the Declaratory Judgment Act, 28 U.S.C. § 2201, to nevertheless dismiss these counts. The motion raises two issues with

respect to Count III: i) whether 47 U.S.C. § 207 prevents the Court from assuming subject matter jurisdiction; and, ii) if not, whether the Court should dismiss or transfer Count III under the doctrine of primary jurisdiction. The Court has limited power to determine whether subject matter jurisdiction exists to hear plaintiffs' complaint. *Shannon v. Shannon*, 965 F.2d 542, 545 (7th Cir.), *cert. denied sub nom. Shannon v. United Serv. Auto. Ass'n*, —— U.S. ——, 113 S.Ct. 677, 121 L.Ed.2d 599 (1992). For the reasons that follow, the Court will dismiss Counts I and II as non-justiciable under Article III of the United States Constitution, as well as pursuant to the Court's discretionary authority to dismiss declaratory judgment actions under 28 U.S.C. § 2201. The Court will also dismiss Count III for lack of subject matter jurisdiction under 47 U.S.C. § 207.

## I. BACKGROUND

Bell Atlantic and MFS compete in the provision of telephone access services for various government and business customers in Delaware, Maryland, New Jersey, Pennsylvania, Virginia, West Virginia, and the District of Columbia. D.I. 33 at ¶ 2. MFS provides telephone access services to its customers in part by purchasing access to Bell Atlantic's networks and connecting MFS's networks to Bell Atlantic's. *Id.* at ¶¶ 3, 38. Telephone access services connect customers to long distance carriers, other telephone customers, and to other telephone exchanges. *Id.* at ¶¶ 2, 38; D.I. 10 at 3.

Competition in this emerging market is fierce; Bell Atlantic and MFS have battled for market share not only in front of customers, but also in the media, the courts, and before the FCC. *See, e.g.,* D.I. 11, Exh. B (Bell Atlantic Complaint before the FCC, No. E–93–017, filed Nov. 17, 1992); Doug Abrams, *Rival Says Area Bell Is a "Bully",* Wash. Times. at B9 (Feb. 16, 1995); Michael Dresser, *FCC Is Asked to Open Local Phone Networks,* Balt. Sun. at 9C (March 8, 1995); D.I. 11, Exh. D (Leslie Cauley, *Bell Atlantic Seeks Court Blessing in Bid To Quiet Critic MFS,* Wall St. J., Feb. 9, 1995 at B6); D.I. 27 at B–78 (Comments Of MFS Communications Company, Inc. On Bell Atlantic's Request For An Expedited Waiver As It Relates To Out–Of–Region InterLATA Services). In this war of words to maintain and grow their respective spheres of business, MFS has made several public statements that Bell Atlantic believes are direct accusations of anti-competitive conduct within the purview of § 2 of the Sherman Act. For example, Bell Atlantic cites a letter from MFS's President and CEO, Royce Holland, addressed to Delano E. Lewis, President and CEO of a Bell Atlantic subsidiary Chesapeake & Potomac Telephone Company ("C & P"). In this letter, Mr. Holland describes connective access sold by C & P to MFS as an "essential facility," discusses what MFS perceived as the "anti-competitive nature" of C & P's pricing, and concludes that "C & P's most recently proposed spectacular increase in rates is tantamount to denying ICC use of the facilities, and lends credence to the increasingly inescapable conclusion that C & P is refusing to deal on reasonable terms and conditions with a competitor." *See* D.I. 27 at B–1, B–3. Bell Atlantic also cites other examples of what it considers to be MFS's accusations of anti-competitive conduct, including an *ex parte* submission by MFS to the FCC that discusses local exchange access pricing by the seven regional Bell operating companies and GTE, *id.* at B–5; a letter from Royce Holland to the FCC that requests sanctions against Bell Atlantic, *id.* at B–70; and comments submitted by MFS on a Bell Atlantic request for an out-of-region InterLATA services waiver, *id.* at B–78.

Bell Atlantic believes that these and other statements are prefatory to a private antitrust enforcement action by MFS, thereby placing Bell Atlantic in a position of great uncertainty as to whether its actions comport with the mandates of federal and state antitrust laws. MFS responds that it has never threatened or proposed an antitrust action against Bell Atlantic and that Bell Atlantic has not pointed to, and cannot point to, any such evidence. D.I. 10 at 4 (citing Bell Atlantic's Amended Complaint (D.I. 33) at ¶¶ 50, 56).

## II. ANALYSIS

■ The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides statutory authority for the federal courts to make prospective declarations regarding "the rights and other legal relations of any interested party seeking such declaration."[1] The Act "does not attempt to change the essential requisites for the exercise of judicial power," *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 242, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952) (quoting *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 325, 56 S.Ct. 466, 473, 80 L.Ed. 688 (1936)), and, therefore, a court must possess both statutory authority and constitutional power in order to have jurisdiction to hear a declaratory plaintiff's complaint, *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671, 70 S.Ct. 876, 878, 94 L.Ed. 1194 (1950). Declaratory plaintiffs consequently face the same jurisdictional hurdles as plaintiffs that bring more traditional causes of action.

### A. Statutory Authority—28 U.S.C. § 1331

■ Bell Atlantic alleges that the Court has statutory power to hear its action pursuant to 28 U.S.C. § 1331. D.I. 33 at ¶ 34. Section 1331 gives the Court authority to hear "all civil actions arising under the Constitution, laws, or treaties of the United States," provided the face of the complaint demonstrates that the plaintiff relies on federal law to gain her desired relief, *Franchise Tax Bd. v. Construction Laborers Vacation Trust*, 463 U.S. 1, 10 n. 9, 103 S.Ct. 2841, 2846 n. 9, 77 L.Ed.2d 420 (1983). When a party brings an action under the Declaratory Judgment Act, the complaint will arise under federal law for purposes of § 1331 if the declaratory action's correlative coercive suit, i.e. the coercive suit that the declaratory defendant could have filed, would present a federal claim as part of its well-pleaded complaint. *See, e.g., id.* at 16 n. 14, 103 S.Ct. at 2849 n. 14.

Bell Atlantic's complaint seeks a declaration that Bell Atlantic does not violate "federal or state antitrust law." D.I. 33 at ¶¶ 1, 50 (Count I Prayer for Relief), 56 (Count II Prayer for Relief). Solely citing the Third Circuit Court of Appeals decision in *La Chemise Lacoste v. Alligator Co.*, 506 F.2d 339 (3d Cir.1974), *cert. denied*, 421 U.S. 937, 95 S.Ct. 1666, 44 L.Ed.2d 94 (1975), MFS asserts that the Court does not have statutory authority to hear a complaint styled in this manner because to have original federal jurisdiction, a declaratory action cannot assert alternative state and federal causes of action. *See* D.I. 10 at 20 ("The law in the Third Circuit is unambiguous. When the 'anticipated lawsuit' in a federal Declaratory Judgment action might be based on *either* federal *or* state law, the character of the threatened action is not necessarily federal, and therefore no federal question jurisdiction exists."); *see generally id.* at 18–21; D.I. 31 at 12–14.

In *La Chemise Lacoste*, the plaintiff brought a declaratory judgment action in the Delaware Court of Chancery, stating in its complaint that:

> [d]efendant has heretofore wrongfully threatened, and continues to threaten, to interfere with plaintiff's said sale of toiletries identified by said crocodile emblem in Delaware, and elsewhere in the United States, by threatening to bring suit against plaintiff and against one or more of the enterprises constituting said authorized channels of distribution of toiletries to enjoin or curtail said sales.

506 F.2d at 342. Expecting that the declaratory plaintiff was seeking relief under the Lanham Act, the defendant attempted to remove the case to the district court. The court of appeals held that the complaint was not removable, and ordered the district court to remand the case to state court, because the complaint made "federal relief ... only one of three available avenues of litigation" and, without a definite statement that federal relief was sought, did not show that the plaintiff relied on federal law to gain its desired relief. *Id.* at 346. The critical fact

---

**1.** 28 U.S.C. § 2201(a) states:

In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

behind this conclusion was that the face of the complaint, as set out above, did "not specifically assert that Alligator will bring an action based on its federal rights." *Id.* at 345.

▪ MFS urges that because Bell Atlantic's complaint seeks a declaration that Bell Atlantic has not violated "federal *or* state antitrust law," the complaint does not permit the Court to conclude that federal antitrust relief is sought. This proposed application of *La Chemise Lacoste* is unwarranted. *La Chemise Lacoste* does not rest on the proposition that no original federal jurisdiction existed because the plaintiff sought alternative state and federal relief. No original federal question jurisdiction existed in *La Chemise Lacoste* because the court could not ascertain, " 'as a matter of practical wisdom or of the record,' " whether defendant would ever raise a federal trademark law claim. *Id.* (footnote omitted). The request for federal relief must appear on the face of the complaint so that the jurisdictionally limited federal courts can determine with certainty that the statutory jurisdictional predicates exist prior to exerting any power over the action. Had the *La Chemise Lacoste* plaintiff affirmatively stated in its complaint that it sought relief on federal trademark grounds, without doubt the court of appeals would have found that original federal jurisdiction existed over the case. *See, e.g., Westmoreland Hosp. Ass'n v. Blue Cross*, 605 F.2d 119, 123 (3d Cir.1979) (holding that removal jurisdiction existed under the rule of *La Chemise Lacoste* because the complaint averred a cause of action under federal law, "[n]otwithstanding ... that it would have been possible to decide the contract solely on state law precepts" or that the federal cause of action was ultimately "unnecessary for the ultimate disposition of the case"), *cert. denied*, 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980).

The uncertainty as to the presence of federal law on the face of the complaint that troubled the *La Chemise Lacoste* court does not exist in this case. Whether Bell Atlantic must ultimately defend against federal antitrust claims or not, the complaint clearly states that Bell Atlantic seeks a judgment as to its potential federal antitrust liability.

Moreover, as a matter of practical wisdom and pure semantics, Bell Atlantic's use of "or" in phrasing its prayer for relief fairly conveys the idea that MFS's correlative coercive pleading would read "MFS brings this action under federal and state antitrust laws" and thus fall within the court's original jurisdiction. That the coercive complaint would read in this manner is illustrated by a pair of hypothetical arguing children: M tells B "you took my fruit and my stapler." B denies the accusation, asks her parents (who have the ability to decide whether B took the items or not) to "tell M I didn't take her fruit or stapler." Placed in context of the allegation by M, B's statement can hardly be said not to raise the question of whether B took the fruit. B is not asking for a decision as to whether B took the fruit but not the stapler or whether B took the stapler but not the fruit; B wants a decision on both issues, and it seems that Bell Atlantic wants the same in this case.

Finally, nothing in *La Chemise Lacoste* suggests that alternative assertions of federal and state causes of action preclude the exercise of federal question jurisdiction. This conclusion comports with the treatment of coercive state and federal claims originally brought in federal court: Federal Rule of Civil Procedure 8(e)(2) permits parties to plead alternative claims; 28 U.S.C. § 1331, *et seq.*, supplies original federal jurisdiction over the federal claims; and the supplemental jurisdiction statute, 28 U.S.C. § 1367, provides authority to hear related state claims. Overall, because the face of Bell Atlantic's complaint demonstrates that Bell Atlantic seeks relief on federal grounds, unlike the face of the complaint in *La Chemise Lacoste*, the Court concludes that it has statutory authority to hear this case.

### B. *Constitutional Power—Article III § 2*

▪ The Court's constitutional power to entertain a cause of action stems from Article III of the United States Constitution. Article III section 2 empowers the courts of the United States to adjudicate only matters that present a "case" or "controversy." *Flast v. Cohen*, 392 U.S. 83, 94, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947 (1968); *Aetna Life Ins. Co. v.*

*Haworth,* 300 U.S. 227, 239, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937); *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio,* 40 F.3d 1454, 1462 (3d Cir.1994); *Armstrong World Indus. v. Adams,* 961 F.2d 405, 410 (3d Cir.1992). This constitutional question of whether a matter presents an Article III "case" or "controversy" is addressed under the general rubric of justiciability; " '[c]oncerns of justiciability go to the power of the federal courts to entertain disputes, and to the wisdom of their doing so. We presume that federal courts lack jurisdiction unless the contrary appears affirmatively from the record.' " *Presbytery of New Jersey v. Florio,* 40 F.3d at 1462 (quoting *Renne v. Geary,* 501 U.S. 312, 316, 111 S.Ct. 2331, 2336, 115 L.Ed.2d 288 (1991) (internal quotations omitted)).

▮ The party seeking judgment must demonstrate that its cause of action falls within the contours of Article III.[2] *Cardinal Chem. Co. v. Morton Int'l, Inc.,* —— U.S. ——, ——, 113 S.Ct. 1967, 1974, 124 L.Ed.2d 1 (1993) (citing *Aetna Life Ins. Co. v. Haworth,* 300 U.S. at 240–41, 57 S.Ct. at 463–64); *see generally Thomson v. Gaskill,* 315 U.S. 442, 446, 62 S.Ct. 673, 675, 86 L.Ed. 951 (1942) ("[I]f a plaintiff's allegations of jurisdictional facts are challenged by the defendant, the plaintiff bears the burden of supporting the allegations by competent proof."); *Packard v. Provident Nat'l Bank,* 994 F.2d 1039, 1045 (3d Cir.) (holding that the party asserting jurisdiction carries the burden to demonstrate that jurisdiction exists), *cert. denied sub nom. Upp v. Mellon Bank, N.A.,* —— U.S. ——, 114 S.Ct. 440, 126 L.Ed.2d 373 (1993). When the defendant makes a factual attack on the Court's jurisdiction, the Court may consider affidavits and other materials to ascertain whether power exists to hear the case. *Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1010 n. 4, 91 L.Ed. 1209 (1947); *International Assoc. of Machinists & Aero-*

*space Workers v. Northwest Airlines, Inc.,* 673 F.2d 700, 711 (3d Cir.1982).

▮ Numerous overlapping doctrines, including standing, ripeness, and mootness, define the boundaries of Article III justiciability. Due to the prospective nature of the relief requested under the Declaratory Judgment Act, declaratory actions most commonly, but not exclusively, implicate the justiciability doctrine of ripeness. The ripeness doctrine attempts to define *when* an otherwise proper party may bring an action. *Presbytery of New Jersey v. Florio,* 40 F.3d at 1462; *see generally id.* at 1462–70; *Armstrong World Indus. v. Adams,* 961 F.2d at 411–24; *Step–Saver Data Sys., Inc. v. Wyse Tech.,* 912 F.2d 643, 646–52 (3d Cir.1990); *cf. Salvation Army v. Department of Community Affairs,* 919 F.2d 183, 191–94 (3d Cir.1990) (analyzing whether an actual controversy existed); *but see id.* at 202 (Becker, J., *dubitante* ) (discussing same issue in terms of ripeness).

▮ The Supreme Court in the context of pre-enforcement review has stated that ripeness implicates two primary considerations, "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The Third Circuit Court of Appeals has "refined this test because of the difficulty in defining ripeness in actions initiated before an 'accomplished' injury is established." *Armstrong World Indus. v. Adams,* 961 F.2d at 411. As articulated by the court of appeals, ripeness of a declaratory judgment action hinges on "the adversity of the interest of the parties, the conclusiveness of the judicial judgment and the practical help, or utility, of that judgment." *Step–Saver Data Sys., Inc. v. Wyse Tech.,* 912 F.2d at 647; *see also Freehold Cogeneration Assoc., L.P. v. Board of Regulatory Comm'rs,* 44 F.3d 1178, 1188 (3d

---

**2.** In concert with Article III, the Declaratory Judgment Act requires "a case of actual controversy." This requirement is coextensive with the justiciability requirements imposed by Article III. *See, e.g., Aetna Life Ins. Co. v. Haworth,* 300 U.S. at 239–40, 57 S.Ct. at 463–64; *Interdynamics, Inc. v. Firma Wolf,* 698 F.2d 157, 166 (3d Cir. 1982) (citing *Cutaiar v. Marshall,* 590 F.2d 523,

527 (3d Cir.1979)); *ACandS, Inc. v. Aetna Cas. & Sur. Co.,* 666 F.2d 819, 822 (3d Cir.1981) ("A federal court's authority to grant declaratory relief ... extends to the article III limits on the court's power to adjudicate disputes.") (citing *Aetna Life Ins. Co. v. Haworth,* 300 U.S. at 239–40, 57 S.Ct. at 463–64).

Cir.1995), *cert. den.,* —— U.S. ——, 116 S.Ct. 68, 133 L.Ed.2d 29 (1995); *Presbytery of New Jersey v. Florio,* 40 F.3d at 1463–64; *Armstrong World Indus. v. Adams,* 961 F.2d at 411. The court of appeals further discusses at least two different, albeit intertwined, facets of the adversity of interest prong of its ripeness test—whether the plaintiff alleges that "present harms will flow from the threat of future action," *id.* at 412; *Presbytery of New Jersey v. Florio,* 40 F.3d at 1463, 1466; *cf. Salvation Army v. Department of Community Affairs,* 919 F.2d at 192 (discussing similar test in terms of justiciability), or, as a subset of this first facet, whether the plaintiff's action is contingent, i.e., whether the action requires the occurrence of some future event before the action's factual predicate is complete, *Armstrong World Indus. v. Adams,* 961 F.2d at 411–12. To show adversity of interest when a plaintiff fears "present harms will flow from the threat of future actions ... 'the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* at 412 (quoting *Salvation Army v. Department of Community Affairs,* 919 F.2d at 192) (internal quotation omitted) (citations omitted).

Two of the court of appeals' recent declaratory judgment ripeness opinions deal with the contingency facet of the adversity of interest prong of the ripeness test. *See Armstrong World Indus. v. Adams,* 961 F.2d at 413–420; *Step–Saver Data Sys., Inc. v. Wyse Tech.,* 912 F.2d at 647–48. In the cases falling within this branch of the adversity of interest analysis, the cause of action, and thereby adversity of interest between the parties, does not accrue until some future factual event occurs. Without the occurrence of the future event, the parties may take different legal positions as to the significance of the event if the event occurs, but that difference alone does not provide the requisite adversity of interest to make the proposed cause of action justiciable until the future event actually occurs.

In *Step–Saver Data Sys., Inc. v. Wyse Tech.,* for example, the plaintiff sought a declaratory judgment as to indemnity from its suppliers if the plaintiff were held liable in a separate suit; at the time of the declaratory judgment action, the plaintiff's liability in the separate suit had not yet come to fruition. 912 F.2d at 646, 647. The court of appeals found that "[t]he main problem with this request lies in its first word, 'if.' Whatever defendants' warranties may have said, the defendants are not liable for damages that Step–Saver itself has not incurred." *Id.* at 647. While this alone made the declaratory action contingent, the fact that an adverse judgment in the declaratory action could make the defendants liable to Step–Saver for product defects that defendants may not have caused also "strongly militate[d] against a finding of adversity." *Id.* at 648. Similarly, in *Armstrong World Indus. v. Adams,* the declaratory judgment plaintiff sought to have a Pennsylvania anti-corporate takeover statute declared invalid because the statute "deter[red] potential tender offerors from placing Armstrong 'in play,'" 961 F.2d at 410, and because the statute allegedly precipitated a "decline in the market value of Armstrong stock," *id.* at 417. At the time of the suit, no one had attempted a corporate takeover so as to trigger the statute and cause harm to the plaintiffs, and the court of appeals again found no adversity of interest. *Id.* at 413, 415, 416, 419.

The court of appeals has explored the second facet of its adversity of interest analysis in *Salvation Army v. Department of Community Affairs,* 919 F.2d at 192–94.[3] In *Salvation Army,* the declaratory plaintiff contended that its action was justiciable due to potential private enforcement of New Jersey's Rooming and Boarding House Act of 1979, but the court of appeals disagreed because nothing in the record evidenced a threat of private enforcement or "provides any other reason to believe that TSA's [The Salvation Army's] professed fear of a [pro-

---

**3.** Although the *Salvation Army* court did not label its discussion in terms of ripeness, subsequent court of appeals opinions have treated the *Salvation Army* analysis as dealing with the ripe-

ness doctrine. *See, e.g., Presbytery of New Jersey v. Florio,* 40 F.3d at 1463, 1466; *Armstrong World Indus. v. Adams,* 961 F.2d at 412.

gram] beneficiary suit is a realistic one." 919 F.2d at 193.

■ The pivotal issue is whether Bell Atlantic suffers a present harm from a potential future private antitrust enforcement action brought by MFS. *See* D.I. 33 at ¶¶ 50, 56. This inquiry is squarely within the ambit of the threat of harm facet of the adversity of interest prong of the court of appeals' ripeness test. Whether this Court has jurisdiction to hear Counts I and II of Bell Atlantic's complaint thus hinges on whether Bell Atlantic can demonstrate that the probability of MFS bringing an antitrust claim against it "is real and substantial, 'of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Armstrong World Indus. v. Adams*, 961 F.2d at 412. The record which Bell Atlantic has made falls far short of this standard.[4]

First, the controlling court of appeals' decisions discussed above teaches that the mere ability of MFS to bring a private antitrust enforcement action does not, without more, rise above the level of an imaginary or speculative fear of suit. Second, Bell Atlantic does not purport to have any evidence of an express threat by MFS to bring a private antitrust enforcement action against Bell Atlantic. *See* D.I. 33 at ¶¶ 50, 56; D.I. 34 at 79 ("THE COURT: Is it correct that there's noth-

ing in the record that MFS directly stated that it would bring an antitrust action against Bell Atlantic? MR. WEBB [Counsel for Bell Atlantic]: That is correct.") (Transcript of Oral Argument). This leaves Bell Atlantic with only indirect evidence to demonstrate that MFS presents a real and substantial threat of a private antitrust enforcement action. Assuming without deciding that indirect evidence is an appropriate basis upon which to ground justicability, attention is turned to the record evidence.

Of four documents relied upon by Bell Atlantic, three derive from the regulatory process. For example, Bell Atlantic relies on MFS's statements dated February 10, 1994, concerning "Bell Atlantic's Request For An Expedited Waiver As It Relates To Out–Of–Region InterLATA Services." D.I. 27 at B–78. Certainly, this document contains the rhetoric and terminology that might be found in an antitrust suit and indicates, at least with respect to Bell Atlantic's Request for an Expedited Waiver, that MFS and Bell Atlantic held antagonistic legal positions.[5] This rhetoric and terminology does not answer whether Bell Atlantic has demonstrated a real and substantial probability of MFS bringing a private antitrust action against it. MFS authored this document as part of the public comment process precipitated by a Bell Atlantic proposal, and all of the state-

4. At oral argument, Bell Atlantic confirmed that it relies solely on the materials contained in the appendix to its answering brief to demonstrate that this action is justiciable. *See* D.I. 34 at 79.

5. Included in this document are statements such as "[b]ased on the MFS experience in dealing with the BOCs in their continuing efforts to maintain their local exchange bottleneck monopolies, MFS strenuously opposes as unprecedented, unsupported, and unnecessary Bell Atlantic's first alternative waiver, which would allow Bell Atlantic and the other RBOCs [regional Bell operating companies] to provide unlimited out-of-region interLATA services," D.I. 27 at B–78; "[a]s long as Bell Atlantic retains its entrenched monopoly power in the local exchange market, the potential for abuse precludes positive consideration of its unlimited interLATA waiver. MFS' [sic] experience with Bell Atlantic confirms that the local bottlenecks still confer an unfair competitive advantage and that Bell Atlantic has been particularly willing to abuse that advantage," *id.* at B–79; "Bell Atlantic's Within Region Conduct to Maintain and Exploit Its Monopoly Under-

scores the Inappropriateness of Granting the Waiver," *id.* at B–82; "[t]he Bell Atlantic tariff was deliberately designed to make it economically impossible for CAPs [competitive access providers, e.g., MFS] to compete with Bell Atlantic, and appropriately led to the partial suspension and investigation of the tariff.... Bell Atlantic's deliberate flouting of the FCC continues to serve its intended purpose of delaying CAP competition," *id.* at B–83 (citation omitted); "[i]n addition to these abuses, Bell Atlantic has attempted to eliminate even the possibility of local competition by lobbying aggressively for state regulation that precludes local competition," *id.* at B–84; and "[t]hese actions are indicative of the productivity of an entrenched monopolist to find ways to abuse its monopoly power, the very concern that lies at the heart of the ongoing MFJ [AT & T divestiture Modified Final Judgment] prohibition on LEC [Local Exchange Carrier] out-of-region interLATA service. Not surprisingly, therefore, RBOC anticompetitive practices have been widespread in virtually every market in which they have been allowed to compete," *id.* (footnote omitted).

ments noted by Bell Atlantic relate to the issue for public comment. When viewed in the context of a public comment, nowhere does the document threaten, or even to the slightest degree imply, that MFS is contemplating an antitrust action; MFS's advocacy of these particular statements does not portend litigation, and bereft of an indication of future litigation, this document does not carry Bell Atlantic's burden to show that the probability of private antitrust enforcement action by MFS is either real or substantial.

Bell Atlantic's other examples of threatening language suffer from the same difficulties. The letter from Royce Holland, MFS's President, dated July 21, 1993, and addressed to the FCC, *see* D.I. 27 at B–71, makes statements about what is described as 'anti-competitive conduct' by Bell Atlantic. Taken out of context, these statements may connote a threat of future litigation. Once again, however, these statement are directly related to a proceeding before the FCC. *See id.* at B–71, B–72. This relationship demonstrates at most what neither MFS nor Bell Atlantic disputes—the parties hold antagonistic legal positions. Likewise, the *"Ex Parte* Submission of Metropolitan Fiber Systems, Inc." to the FCC, *id.* 27 at B–5, addresses itself to FCC rulemaking and does not threaten or imply that unfavorable FCC action would result in an antitrust suit by MFS against Bell Atlantic. In fact, this document addresses alleged predatory pricing tactics of all local exchange carriers and does not even specifically focus on Bell Atlantic.[6] The Court cannot emphasize enough that antagonistic legal positions before a regulatory agency do not, in and of themselves, make the probability of a future private antitrust enforcement action by MFS real or substantial for justicability purposes.

Finally, Bell Atlantic relies on a November, 1991, letter from MFS President Holland to Bell Atlantic subsidiary C & P Telephone. D.I. 27 at B–1. Directly addressed to Bell Atlantic, this letter is perhaps the strongest indication of MFS's position as to the anti-competitive nature of Bell Atlantic's

conduct, yet even this letter falls short of demonstrating a real or substantial probability of future suit. While stating "[t]he anti-competitive nature of these past and proposed actions are clear," MFS never mentioned or implied that an antitrust lawsuit loomed on the horizon. *Id.* at B–3. To resolve MFS's worries, Holland instead "suggest[ed] that we meet as soon as possible to explore any reasonable resolution of these issues." *Id.* While demonstrating a disagreement between competitors and possibly the initial bargaining position of MFS, this letter again does not evidence a probable future suit. Finally, even if this letter does suggest that when looking forward from November, 1991, a future antitrust action was likely, no such action has ensued over the 3½ intervening years. This reality greatly lessens any suggestion that the probability of an antitrust suit is "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Armstrong World Indus. v. Adams,* 961 F.2d at 412 (quotation omitted).

Perhaps tellingly, when challenged to show where the record demonstrates that this case is justiciable, Bell Atlantic discussed not how its evidence showed a real and substantial probability of a future lawsuit, but rather how particular statements showed the parties were "adverse." For example, when Bell Atlantic discusses the adversity of interest prong of the court of appeals' ripeness analysis in its brief, it summarily concludes the parties are adverse because "[t]he positions of the parties are both well-established and 'diametrically opposed.'" D.I. 26 at 11; *see also* D.I. 34 at 52, 53–54 ("Mr. Webb: . . . [T]here's kind of a commonsense, practical wisdom approach to this, and . . . it's to determine . . . is there a real dispute between the parties. And I don't think there's any question that there's any real dispute between the parties."). With this approach, Bell Atlantic embarks on an analysis of justiciability that attempts to finesse the central issue of whether a real and substantial probability exists that MFS will bring a future antitrust action; Bell Atlantic instead focusses on the parties' abstract disagreements, on

---

**6.** Through apparent inadvertence, the Appendix to this document, which contains supporting data, omits details for all local exchange carriers other than Bell Atlantic. *See* D.I. 27 at B–66—B–67 (omitting appendix pages 5–9).

the potential for accruing damages if Bell Atlantic's conduct is eventually found to violate the antitrust laws, and on the absence of contingent facts on which the declaratory judgment action, if justiciable, would be tried; *see supra* text at 842–843. None of these contentions creates adversity of interest or brings Counts I and II within the realm of justiciable controversies.

For example, the simple assertion that the parties disagree on a legal issue does not create adversity of interest or a justiciable controversy, even assuming that Bell Atlantic and MFS *do* have different positions as to the antitrust implications of Bell Atlantic's business operations. In almost any unripe case, the parties have at minimum a difference of opinion, even diametric opposition, as to a legal issue. *Freehold Cogeneration Assoc., L.P. v. Board of Regulatory Comm'rs,* 44 F.3d 1178, 1188 (3d Cir.1995), *cert. den.,* —— U.S. ——, 116 S.Ct. 68, 133 L.Ed.2d 29 (1995), cited by Bell Atlantic, does not stand for the proposition that opposing legal views create adversity. Quite to the contrary, adversity of interest existed to a real and substantial probability in *Freehold Cogeneration* because the government had instituted administrative hearings constituting an affirmative step toward modifying the plaintiff's established contractual rights. *Id.* at 1188. The court of appeals relied on the hearings to find adversity of interest and to demonstrate the 'diametric opposition' in the parties' positions; the court did not equate antagonistic or conflicting interests to its adversity of interest standard. Bell Atlantic's complaint concedes that MFS has not initiated any form of state or federal antitrust enforcement, *see* D.I. 33 at ¶¶ 50, 56, making this case far removed from the factual scenario of *Freehold Cogeneration.* In the end, asserting that MFS and Bell Atlantic hold antagonistic legal positions does no more than cast in different language the fact that Bell Atlantic is asking the Court to render an abstract legal opinion.

■ Bell Atlantic next tries to gloss its problems in satisfying the court of appeals' adversity of interest test by arguing that Counts I and II must be ripe because immediate adjudication of Bell Atlantic's antitrust liability is necessary to avoid the accrual of damages. Neither of the cases cited by Bell Atlantic for this proposition, however, stand for more than a recitation of the policy rationale behind the Declaratory Judgment Act. *See, e.g., Travelers Ins. Co. v. Davis,* 490 F.2d 536, 543 (3d Cir.1974); *Care Corp. v. Kiddie Care Corp.,* 344 F.Supp. 12, 16 (D.Del.1972). While avoiding accrual of damages is a benefit of the Declaratory Judgment Act, a ripe, or justiciable, case depends not on whether the declaratory plaintiff may avoid damages by adjudicating the controversy in the present, but rather on whether the declaratory plaintiff can demonstrate a "substantial hardship to denying preenforcement review when a person is forced to choose between foregoing possibly lawful activity and risking substantial sanctions." Erwin Chemerinsky, *Federal Jurisdiction* 103 (1989).

For example, in *Abbott Lab. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the Supreme Court found the declaratory plaintiffs' cause of action ripe because to either comply or disregard the challenged statute would have imposed substantial difficulties on the declaratory plaintiffs. *See id.* at 152–53, 87 S.Ct. at 1517–18 ("If petitioners wish to comply they must change all their labels, advertisements, and promotional materials; they must destroy stocks of printed matter; and they must invest heavily in new printing type and new supplies. The alternative to compliance ... would risk serious criminal and civil penalties for the unlawful distribution of 'misbranded' drugs."); *see also Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 201–202, 103 S.Ct. 1713, 1720–21, 75 L.Ed.2d 752 (1983) (holding a suit challenging a California statute placing a moratorium on the certification of new nuclear power plants ripe, even though the plant had not yet been built, because "[t]o require the industry to proceed without knowing whether the moratorium is valid would impose a palpable and considerable hardship on the utilities, and may ultimately work harm on the citizens of California").

■ In contrast, the Supreme Court decided *Toilet Goods Ass'n v. Gardner,* 387

U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), on the same day as *Abbott Labs. v. Gardner* and held that case unripe even though the declaratory plaintiff also would have accrued damages in the form of lost sales if it failed to comply with the challenged regulation. The Court found no substantial hardship in denying declaratory relief in that case, explaining that any adverse impact of the regulation could be immediately challenged administratively and thence reviewed by an Article III court and, furthermore, that a refusal to comply with the regulation would at most suspend the operations of the declaratory plaintiff. *Id.* at 165, 87 S.Ct. at 1525. Unquestionably, the declaratory plaintiff would have accrued damages in the form of operational losses without pre-enforcement review; the Supreme Court's holding, however, demonstrates that accrued damages alone will not make a case ripe for adjudication.

Similarly, the Third Circuit Court of Appeals in *Salvation Army* faced the contention that the declaratory plaintiff's suit against private enforcement actions was ripe because "a private suit would include the possibility ... [of] an award of damages" and "might conceivably 'chill' TSA in the current exercise of its First Amendment rights." Even in light of the First Amendment concerns, "a prospect [the court noted] that the Supreme Court has always taken very seriously," the court of appeals held that "allegations of chilling injury [the potential monetary damages] are not sufficient" bases to counteract the declaratory plaintiff's failure to demonstrate a real and substantial likelihood of future suit. 919 F.2d at 193; *cf. Armstrong World Indus. v. Adams*, 961 F.2d at 420 (noting that the plaintiff's allegation of present damages, the deterrence of tender offers and the decline in market value, "does not make up for the contingent nature of their action").

If indeed Bell Atlantic currently violates the antitrust laws, damages may accrue before suit is brought. Nevertheless, no record evidence exists to suggest that these potential damages approach the level of hardship faced by the plaintiffs in *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n* and *Abbott Labs. v. Gardner*. Therefore, until some real and substantial probability of enforcement appears, the Court cannot conclude that Bell Atlantic would suffer any significant hardship if the Court denied review at this time. *See also* D.I. 34 at 73 ("THE COURT: What action has Bell not taken or refrained from taking because of what you [Bell Atlantic] call the threat of an antitrust suit? ... MR. WEBB: Well, as of today, I can't say that there's any particular action that we've taken or not taken. It's that in conducting our business practices today, we don't know what to do.").

Bell Atlantic's third argument for adversity focusses on the observation that the parties' dispute is not "subject to any 'contingency' of the sort that negated adversity in *Step–Saver* ... and in *Armstrong World Industries*." D.I. 26 at 11. The Court agrees that the *Step–Saver* and *Armstrong* style contingencies do not exist in this case because the only conduct an antitrust action brought today could address would be the conduct of Bell Atlantic in the past. As discussed previously, however, the court of appeals' adversity of interest analysis has several facets that help to measure whether a dispute has progressed from an abstract disagreement to a justiciable controversy. Simply because all of the facts that could create liability have occurred does not demonstrate that present harm is flowing from a feared MFS antitrust suit.

Declaratory judgment actions for patent invalidity and non-infringement best demonstrate this principle.[7] Even when a party

---

7. While the parties disagree as to the applicability of the patent cases, primarily because the patent cases couch questions of justiciability in terms of "reasonable apprehension" of suit, the patent cases uniformly involve private enforcement of a statutory scheme and examine whether the declaratory plaintiff can demonstrate the patentee has made a threat of the requisite quanta to demonstrate a live controversy. *See, e.g., BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 978 (Fed.Cir.1993); *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888 (Fed.Cir.1992) ("The test is an objective one, which ... focusses on whether [the declaratory defendant's] conduct rose to a level sufficient to indicate an intent to enforce its patent."). Although some courts have held that the reasonable apprehension formulation is "less rigorous" and applicable only to

has made, used, or sold within the United States an unabashedly infringing product, that party may not bring a declaratory judgment action for invalidity or non-infringement *even though* all of the conduct required to create a live legal dispute has occurred. In the language of the patent cases, a justiciable declaratory suit requires not only an infringing product made, used, or sold, in the United States, but also a reasonable apprehension of suit created by the patentee's conduct. *See, e.g., BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d at 978 ("There must be both (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity."); *see also* Edwin Borchard, *Declaratory Judgments* 807 (2d ed. 1941) ("In other words, the mere existence of the patent is not a cloud on title, enabling any apprehensive manufacturer to remove it by suit. It requires an assertion of right under the patent to place the alleged infringer in gear to join issue and challenge the title."). Only after the patentee acts to create that apprehension may the purported infringer bring suit. Bell Atlantic's complaint presents exactly this scenario; Bell Atlantic cannot assert a real or substantial probability that MFS will bring a future antitrust action against it merely because statements bearing upon possible facts necessary to antitrust liability have been made.

Next, Bell Atlantic contends that in the Third Circuit, a party's *refusal* to waive enforcement "confirm[s] that the threat of an antitrust suit against Bell Atlantic is 'real and substantial' ... and that the adversity prong of the *Step–Saver* test is fully satis-

fied." D.I. 26 at 14–15; *see also id.* at 13 ("[A] party's *refusal* to waive enforcement can support an inference that there *is* a 'real threat' of litigation.") (citing *Presbytery of New Jersey v. Florio*, 40 F.3d at 1468). Bell Atlantic's argument overstates the import of *Presbytery of New Jersey v. Florio.* In *Presbytery of New Jersey v. Florio,* non-waiver of enforcement did not become a harbinger of adversity of interest in its own right, but rather only in juxtaposition with the government's affirmative waiver of the statute at issue in some limited instances.

The declaratory plaintiffs in *Presbytery of New Jersey v. Florio* had challenged New Jersey's Law Against Discrimination in both their institutional and individual capacities as violative of their First Amendment rights under the United States Constitution. After noting that "where intervening events remove the possibility of harm, 'the court must not address the now-speculative controversy,'" *id.* at 1463 (quoting *Salvation Army v. Department of Community Affairs,* 919 F.2d at 192), the court contrasted the state's efforts to forswear prosecution of the institutional plaintiffs with "[t]he pointed nature" of the state's refusal to waive prosecution against the plaintiffs individually, *Presbytery of New Jersey v. Florio,* 40 F.3d at 1468. Drawing on its statement that intervening events may make an otherwise ripe controversy unripe, the court then held that "to the extent this record eliminates any free exercise claims as unripe it does not do so with respect to the individual free expression claims [plaintiff] Cummings appears to advance." *Id. Presbytery of New Jersey v. Florio* thus makes clear that waiving enforcement may eliminate an otherwise real and substantial probability of a future event, while failing to waive enforcement, on the other-hand, does not require the Court to

---

patent cases, *see, e.g., National Hockey League v. National Hockey League Players Ass'n,* 789 F.Supp. 288, 294 n. 12 (D.Minn.1992), the identity in procedural posture, as well as the apparent identity of the two ripeness formulations' goals, purposes, and practical effect, leads the Court to conclude that the 'reasonable apprehension' standard provides at least persuasive authority in applying the adversity of interest analysis to private party enforcement actions.

Moreover, one may question the *National Hockey League* court's assertion that the constitutional standard of justiciability can be less rigorous in a patent case than in other litigation contexts. Article III section 2 of the constitution, after all, sets an outer immutable bound of justiciability in the federal courts, and, since the passage of the Declaratory Judgment Act, the courts have stated that the Act's 'actual controversy' requirement extends to the boundary of justiciable cases under Article III.

conclude that the probability of future action is either real or substantial. To embrace the conclusion urged by Bell Atlantic requires the Court to succumb to the logical fallacy of denying the antecedent; nothing in *Presbytery of New Jersey v. Florio* suggests that because waiver may equate to an unripe case, non-waiver must equate to a ripe controversy.

One final difference obtains between *Presbytery of New Jersey v. Florio, Salvation Army v. Department of Community Affairs,* and Bell Atlantic's complaint. *Presbytery of New Jersey v. Florio* and *Salvation Army v. Department of Community Affairs* featured real and substantial threats of future enforcement *by the government;* this case does not, and Bell Atlantic provides no authority that a waiver requirement exists in any context other than government enforcement schemes. Furthermore, the Court's own perusal of the patent cases, as well as other civil declaratory judgment cases, also fails to reveal any instances of requiring waiver of a private enforcement action prior to concluding a complaint is non-justiciable. *Cf. BP Chemicals Ltd. v. Union Carbide Corp.,* 4 F.3d at 980 ("Although a patentee's refusal to give assurances that it will not enforce its patent is relevant to the [justiciability] determination ... this factor is not dispositive.") (internal citation omitted). Certainly, cases exist where the converse is true; an affirmative forbearance of private enforcement actions has been used to demonstrate that no real or substantial probability of suit exists, *see, e.g., National Hockey League v. National Hockey League Players Ass'n,* 789 F.Supp. 288, 295 (D.Minn.1992), but these cases apply nothing more than the rule of *Presbytery of New Jersey v. Florio* and do not require forbearance to make a suit unripe.

In this vein, *Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.,* 655 F.2d 938 (9th Cir.1981), provides no support to Bell Atlantic. Contrary to Bell Atlantic's assertion, the court of appeals in this patent case did not predicate a finding of ripeness on the "declaratory defendant's refusal to pledge that it will not sue." D.I. 26 at 14. Rather, the court found the declaratory de-

fendant's refusal to waive suit relevant in comparison to the declaratory defendant's prior statement that it would sue for patent infringement if the plaintiff continued to sell the allegedly infringing devices, *Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.,* 655 F.2d at 944–45; again, the juxtaposition of the threat to sue and the subsequent refusal to waive enforcement created a real and reasonable "apprehension that it [the declaratory plaintiff] could be subject to liability for patent infringement," *id.* at 945. As discussed previously, the Court finds that MFS's statements do not demonstrate a real or substantial probability of future suit, and, in the absence of a requirement that the Court consider the waiver of, or the failure to waive, enforcement dispositive, the Court declines to accept Bell Atlantic's proposition and holds that the absence of a stipulation by MFS that it will not sue Bell Atlantic in antitrust over Bell Atlantic's past conduct creates no adversity of interest nor otherwise makes Bell Atlantic's cause of action justiciable.

In the end, perhaps the case closest in posture to the present matter is *National Basketball Ass'n v. SDC Basketball Club, Inc.,* 815 F.2d 562 (9th Cir.1987), *cert. dismissed sub nom. Los Angeles Memorial Coliseum Comm'n v. National Basketball Ass'n,* 484 U.S. 960, 108 S.Ct. 362, 98 L.Ed.2d 386 (1987). While the parties disagree as to the applicability of this case, *National Basketball Ass'n v. SDC Basketball Club* stems from a procedural posture quite similar to that evident in this case—private enforcement of the federal antitrust laws. In *National Basketball Ass'n v. SDC Basketball Club,* the plaintiff wanted to take certain actions that the defendant specifically and repeatedly asserted would violate federal antitrust law. *Id.* at 564, 566. On that basis, the court held that "[s]ince the NBA's 'real and reasonable apprehension' ... was that any action on the [defendant] Clippers' move could result in antitrust liability, the case is justiciable." *Id.* (internal citation omitted). In the parlance of the Third Circuit Court of Appeals ripeness analysis, *National Basketball Ass'n v. SDC Basketball Club* could be characterized as one in which "the probability of that future event occurring is real and substantial,

of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Armstrong World Indus. v. Adams,* 961 F.2d at 412 (quotations omitted).

Nothing in Bell Atlantic's complaint or exhibits approaches the factual scenario found in *National Basketball Ass'n v. SDC Basketball Club.* Where *National Basketball Ass'n v. SDC Basketball Club* hinged on repeated threats of an antitrust liability, Bell Atlantic can at best point to antagonistic rhetoric before regulatory bodies. Adversity of interest between MFS and Bell Atlantic does not appear on the record before the Court because none of Bell Atlantic's proffered examples evinces a real or substantial "probability of an antitrust suit that is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Armstrong World Indus. v. Adams,* 961 F.2d at 412 (quotation omitted). Because Bell Atlantic fails to demonstrate adversity of interest, the Court concludes that Counts I and II of Bell Atlantic's complaint are unripe and therefore non-justiciable.[8]

### C. *Discretionary Dismissal under the Declaratory Judgment Act*

▮ The Declaratory Judgment Act permits the Court to decline to adjudicate otherwise justiciable cases within the court's jurisdiction. 28 U.S.C. § 2201(a) (a court "may declare"); *Wilton v. Seven Falls Co.,* — U.S. —, —, ————, 115 S.Ct. 2137, 2140, 2142–43, 132 L.Ed.2d 214 (1995); *Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163, 1170 (3d Cir.1987); *Akzona Inc. v. E.I. du Pont de Nemours & Co.,* 662 F.Supp. 603, 617 (D.Del.1987) (" 'If the Court is of the opinion that the action will not serve a useful purpose, or that it is otherwise undesirable, then it should refuse to proceed.' ") (quoting 6A J. Moore, *Federal Practice,* ¶ 57.20 (2d ed. 1979)). Even if this action were justiciable on the basis of the documents proffered by Bell Atlantic, the Court would nevertheless exercise its discretion to dismiss Counts I and II because of the nature of these documents. As noted previously, three out

of the four examples proffered by Bell Atlantic stemmed from proceedings before, or related to, administrative regulatory agencies, and in these documents, MFS tied its rhetoric directly to the relevant proceeding. For fear of chilling vigorous advocacy, the Court would decline to base an adjudication of Bell Atlantic's complaint on these documents absent some other indication of a real or substantial probability of a future antitrust action by MFS.

### D. *Count III—Damages for Alleged Violations of 47 U.S.C. § 203*

In Count III, Bell Atlantic seeks a declaration that MFS has violated 47 U.S.C. § 203(a), a declaration that this violation constitutes a complete defense to any antitrust claims, an injunction against MFS's operations in interstate commerce until MFS complies with the statute, and monetary damages for violating the statute. D.I. 33 at ¶ 66 (Count III Prayer for Relief). Section 203(a), the filed tariff statute, requires common carriers of interstate communications services to file for public inspection "schedules showing all charges" for those interstate services. In its complaint, Bell Atlantic asserts that MFS provided interstate communications services without filing any tariff in the period preceding February, 1993, *id.* at ¶ 60, and that, after February, 1993, MFS provided interstate communications services with a filed tariff that does not meet the requirements of § 203(a), *id.* at ¶ 61.

▮ MFS bases its motion to dismiss Count III for lack of subject matter jurisdiction on 47 U.S.C. § 207, arguing that § 207 bars Count III because Bell Atlantic has previously elected to pursue its § 203(a) claims with the FCC. *See* D.I. 10 at 30–32. Section 207 provides that:

> Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of

---

8. Because Bell Atlantic cannot demonstrate adversity of interest, the Court does not address whether or not the remaining two ripeness factors would support a finding of ripeness in this case.

this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

The Court holds that § 207 bars Bell Atlantic from bringing its § 203(a) claim before this Court. To explain this result, however, the Court must first describe the recent litigation surrounding § 203(a) and how it has impacted the actions of Bell Atlantic and MFS.

In the 1980's, the FCC exempted certain "non-dominant" carriers, including MFS, from filing the schedules of rates required by § 203(a). The United States Court of Appeals for the District of Columbia Circuit eventually found that this policy violated the terms of the statute. *See American Tel. & Tel. Co. v. FCC,* 978 F.2d 727 (D.C.Cir.1992), *cert. denied sub nom. MCI Telecommunications Corp. v. American Tel. & Tel. Co.,* — U.S. —, 113 S.Ct. 3020, 125 L.Ed.2d 709 (1993). Immediately following this decision, Bell Atlantic filed a complaint against MFS before the FCC, seeking injunctive and monetary relief for MFS's failure to file a tariff pursuant to § 203(a) as interpreted by the court of appeals. *See* D.I. 11, Exh. B (Complaint *In the Matter of Bell Atlantic Tel. Co. v. MFS Telecom, Inc.,* FCC File No. E–93–017 (Nov. 17, 1992)).

Bell Atlantic next filed a motion for summary judgment, arguing that no genuine issue of material fact existed to delay a finding that MFS's range tariff filing violated the requirements of § 203(a). *See* D.I. 11, Exh. C. Sometime later, the FCC issued a regulation that permitted non-dominant carriers to meet their obligations under § 203(a) by filing a "reasonable range" of tariffs rather than a unitary set of rates. Forty-six days after the FCC had promulgated this ruling, MFS filed a range of rates that complied with the FCC regulation.

The record reveals no action on Bell Atlantic's motion for summary judgment or any other activity with regard to Bell Atlantic's FCC complaint until mid–1994, when the Supreme Court affirmed a separate opinion of the District of Columbia Circuit Court of Appeals that had held the FCC's non-dominant carrier exemption from § 203(a) violated the terms of the statute. *See MCI Tele-*

*communications Corp. v. American Tel. & Tel. Co.,* — U.S. —, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994). After the Supreme Court issued its decision, Bell Atlantic renewed its request for action on its initial complaint in a "Petition For Immediate Action & Additional Summary Relief," filed with the FCC under the same caption and action number as its original pleading against MFS. *See* D.I. 27 at B–96. In this petition, Bell Atlantic argued that MFS's 46 day delay in filing the range tariff constituted "a willful and repeated violation subject to forfeiture under Section 503(b) of the Communications Act." *Id.* at B–99. MFS opposed the relief sought by Bell Atlantic and filed multiple papers in its defense. *See, e.g., id.* at B–102 (Opposition To [Bell Atlantic's] Petition). MFS particularly opposed Bell Atlantic's petition on the grounds that Bell Atlantic's FCC complaint addressed only MFS's previous failure to file tariffs, an issue "mooted[ ] since MFS Telecom has filed a tariff consistent with the FCC rules." *Id.* at B–102. MFS also argued that the lawfulness of its range tariffs could not be before the FCC because that issue would "raise new issues relating to a different time period … [and] based on different facts," *id.* at B–103.

Both parties agree on this essential background and agree, at least implicitly, that the Court's application of § 207 controls the outcome of MFS's motion. The parties differ primarily on how to apply § 207 to Bell Atlantic's two complaints, each of which Bell Atlantic argues "involve[ ] different practices and raise[ ] discrete issues." D.I. 26 at 25–26. Bell Atlantic also argues that § 207 does not bar this Court from hearing Count III because the FCC has failed to act on Bell Atlantic's complaint within the twelve months allotted by 47 U.S.C. § 208(b)(1). *Id.* at 27–29. MFS responds that § 207 forces a "claiming carrier," such as Bell Atlantic, to elect the forum for suit—either the FCC or the district court—and that, once the party makes its election, § 207 prohibits the party from pursuing its claims in the remaining forum. Because, from the viewpoint of MFS, "Bell Atlantic already has filed a formal complaint with the FCC relating to the very practices it complains of in Count III," D.I.

10 at 29, MFS concludes that Bell Atlantic has elected to proceed before the FCC and that § 207 therefore prevents this Court from adjudicating Count III.

■ No extant caselaw applies § 207 to complaints brought before both the district court and the FCC, where each complaint arguably subsumes conduct addressed by the other. Nor does § 207's common ancestor, former § 9 of the Interstate Commerce Act.[9] *See* Act of February 4, 1887, ch. 104, § 9, 24 Stat. 379, 382, *repealed by* Revised Interstate Commerce Act of 1978, Pub.L. 95–473, § 4(b), October 17, 1978, 92 Stat. 1337, 1466–70. At most, the Supreme Court has stated with regard to § 9, in dicta, "[i]t may therefore be assumed that after a shipper has elected to initiate a Commission proceeding for damages he could not later initiate an original district court action for the same damages." *United States v. Interstate Commerce Comm'n*, 337 U.S. 426, 434, 69 S.Ct. 1410, 1415, 93 L.Ed. 1451 (1949). Despite the paucity of binding precedent, Bell Atlantic's argument fails for two reasons.

First, Count III alleges that MFS violated § 203(a) in two ways: Paragraph 60 asserts that MFS operated unlawfully in the period before MFS first filed its tariffs, and paragraph 61 asserts that MFS has operated unlawfully under the tariffs that MFS *has* filed with the FCC. Contrary to Bell Atlantic's brief, the complaint is not limited to the conduct alleged in paragraph 61. *See, e.g.,* D.I. 33 at ¶¶ 63 ("MFS has filed no tariffs specifying fixed charges for any of the interstate communication services it provides. MFS is therefore operating, *and has operated,* unlawfully as a common carrier providing interstate communication services, in violation of the Act.") (emphasis added), 66 ("MFS's failure to file and publish schedules showing all charges for interstate communication services constitutes a violation of the Communications Act") (Count III Prayer for Relief). Bell Atlantic's complaint and its relevant pleadings before the FCC fairly place before the FCC the same issues of MFS's

compliance with § 203(a) that are included in Count III. *See, e.g.,* D.I. 11, Exh. B at ¶ 3 (arguing that MFS violated § 203(a) by failing to file a schedule of charges) (Bell Atlantic Complaint to the FCC); *id.,* Exh. C at A–13 (arguing that MFS's February 22, 1993, tariff filings were unlawful) (Bell Atlantic Motion for Summary Judgment); D.I. 27 at B–100 (arguing that both MFS's initial failure to file a tariff and MFS's tariff filings were unlawful) (Bell Atlantic's Petition For Immediate Action And Additional Summary Relief).

■ MFS does not suffer any preclusive effect from its argument to the FCC that Bell Atlantic's FCC complaint does not cover the conduct addressed in Count III. As a general matter, issue preclusion attaches only at the time of final judgment, *see Restatement (Second) of Judgments,* § 13 (1982), and the FCC has not issued any judgment on Bell Atlantic's complaint, let alone a final judgment. Additionally, the record is devoid of any indication that Bell Atlantic has attempted to clarify the scope of its complaint before the FCC or to narrow its FCC complaint so that it and Count III cover distinct legal and factual issues. *See also* D.I. 34 at 107–08 (stating that until the Court rules on this motion, Bell Atlantic will not abandon its position before the FCC that its FCC complaint covers both MFS's pre- and post-February 1993 conduct). On this record, the Court necessarily finds that Bell Atlantic has attempted, at a minimum, to place the same legal issues before both the FCC and this Court. For that reason alone, § 207 would appear to prohibit Bell Atlantic from pressing Count III in this forum and to prohibit this Court from exercising its power to adjudicate those claims.

Moreover, while Bell Atlantic argues that the FCC's inaction permits Bell Atlantic to file the same claims in this Court as it had previously filed before the FCC, Bell Atlantic offers no explanation as to why or how its choice of fora becomes, in a sense, 'reset' in the face of FCC inaction. Title 47 offers no

---

9. When provisions of the Federal Communications Act and the Interstate Commerce Act share a common origin and common language, decisions interpreting one statute may provide persuasive authority in interpreting the other. *Southwestern Bell Corp. v. FCC,* 43 F.3d 1515, 1522 (D.C.Cir.1995) (collecting cases).

indication that a party's election of fora, once made, is anything but irrevocable. In contrast, the District of Columbia Circuit Court of Appeals has held that the power to remedy agency inaction lies exclusively with the court of appeals which would hold appellate jurisdiction over the agency decision. *Telecommunications Research & Action Center v. FCC,* 750 F.2d 70, 75 (D.C.Cir.1984). Finally, the Supreme Court has indicated that "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *United States v. James Daniel Good Real Property,* —— U.S. ——, ——, 114 S.Ct. 492, 506, 126 L.Ed.2d 490 (1993); *see also Gottlieb v. Pena,* 41 F.3d 730, 734 (D.C.Cir.1994) (noting that "this court has repeatedly concluded that missing a statutory deadline does not divest an agency of authority over a case or issue.... [in part due to] the recognition that Congress is fully able to specify the consequence of an agency's failure to abide by a statutory deadline when it chooses to do so.") (footnote and citations omitted). Nothing in Title 47 suggests that this general principle does not apply to an action brought pursuant to § 207.

 These factors lead the Court to conclude that it has no power to hear a case properly filed with the FCC simply because the FCC itself has not complied with the statutory requirements surrounding complaints. By the terms of § 207, the choice to proceed in one or the other available forum destroys jurisdiction in the remaining body; the electing party must then accept and work through the problems of reaching a judgment. Thus, when a party has elected to proceed before the FCC, the solution to agency inaction lies with the court of appeals. *See Telecommunications Research & Action Center v. FCC,* 750 F.2d at 75 ("We think it is clear ... that the statutory commitment of review of FCC action to the Court of Appeals, read in conjunction with the All Writs Act, 28 U.S.C. § 1651(a) (1982), affords this court jurisdiction over claims of unreasonable Commission delay.").

In sum, the Court finds that Bell Atlantic previously elected to proceed before the FCC with regard to MFS's alleged violations of § 203(a). The broad scope of Bell Atlantic's FCC complaint, coupled with Bell Atlantic's arguments to the FCC that that complaint covers the same conduct alleged in Count III, prevents Bell Atlantic from bringing Count III in this Court. The bar of § 207 on jurisdiction in this Court will prevent duplicative adjudications and inconsistent results between this Court and the FCC; Bell Atlantic must therefore follow its election of fora and proceed with its § 203(a) claims before the FCC.[10]

### III. CONCLUSION

For the reasons discussed above, the Court will grant MFS's motion to dismiss all Counts of Bell Atlantic's complaint for lack of subject matter jurisdiction. An appropriate order will issue.

---

**10.** Because the Court will dismiss Count III for lack of jurisdiction under 47 U.S.C. § 207, the Court does not reach MFS's contention that the Court should dismiss Count III under the doctrine of primary jurisdiction.